# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br><br>S.R.P.W. (dob: 03/14/2012); K.R.T.W. (dob: 02/17/2011); and K.R.-K.W. (dob: 02/28/2013),<br><br>Minor Children.<br><br>STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES,<br><br>Respondent,<br><br>v.<br><br>SHARRAH WOOD,<br><br>Appellant. | No. 78195-2-I<br>(Consolidated with No. 78196-1-I and No. 78197-9-I)<br><br><br>DIVISION ONE<br><br><br><br>UNPUBLISHED OPINION<br><br><br><br>FILED: January 14, 2019 |

LEACH, J. — Sharrah Wood appeals the termination of her parental rights to three children. She claims that substantial evidence does not support the trial court's finding that all necessary services capable of remedying her parental deficiencies were offered or provided, that a neuropsychological evaluation was not a necessary service, and that termination of her parental rights was in the best interests of the children. We disagree and affirm.

## FACTS

Sharrah Wood is the mother of three children ranging from seven to five years of age: K.R.T.W., S.R.P.W., and K.R.-K.W.[1] The parental rights of the children's fathers are not at issue in this appeal.[2]

In April 2015, Wood and her three children lost their housing due to flooding. The family then reportedly began living in a van with Wood's mother, Wood's sister, and her sister's two young children. When not living in the van, the family stayed on the floor of friends' houses. Once notified, the Department of Social and Health Services[3] (Department) offered Wood voluntary services that included Family Assessment Response (FAR) and Project SafeCare. Wood initially participated in these services, but she was unable to complete them.

In December 2015, the Department received allegations that Wood's children were continuing to be neglected and suffering from housing instability. On December 22, 2015, the Department filed a dependency petition for each child based on Wood's alleged lack of supervision, chronic neglect, mental health issues, lack of parenting skills, and lack of safe and stable housing. At the shelter care hearing on December 30, 2015, the trial court removed the children from Wood's care. They never returned to her care.

---

[1] Wood is also the mother to another child, K.W. Her parental rights as to K.W. were previously terminated and are not at issue in this appeal.

[2] The parental rights of the fathers of S.R.P.W. and K.R.-K.W. were previously terminated. At the time of trial, the parental rights of the father of K.R.T.W. were still intact.

[3] As of July 1, 2018, the "Department of Children, Youth, and Families" has assumed the functions and duties of the Department of Social and Health Services. See RCW 43.216.906.

In April 2016, the Department filed agreed dependency and disposition orders for each child. The Department identified Wood's primary parenting deficiencies as mental health issues, lack of parenting skills, and lack of stable and suitable housing. Throughout the course of the dependency, the Department offered Wood multiple services designed to help remedy her parental deficiencies. These services included a psychological evaluation with a parenting component, a mental health assessment and individual counseling, parenting classes, family preservation services, case management, random urinalyses (UAs), a drug and alcohol evaluation, and Project Aware (domestic violence support group). Among other things, the trial court's dependency orders required Wood to notify the Department about any problems in accessing services.

At later dependency review and permanency planning hearings, the trial court determined that Wood was either partially in compliance or not in compliance with its orders and that Wood was not making progress toward correcting her parental deficiencies. In March 2017, the Department filed a petition to terminate Wood's parental rights to each child. The Department made the same allegations for each child and asserted that Wood "does not understand and is incapable of providing for the child's emotional, physical, mental, and developmental needs. [Wood] is incapable of safely parenting the child."

The termination trial took place over several days in January 2018. After hearing testimony from Wood, a Department social worker, a family preservation services provider, two visitation supervisors, K.R.-K.W.'s counselor, a chemical dependency

provider, a psychologist, and considering more than 60 exhibits, the trial court ordered termination of Wood's parental rights as to all three children. In its termination order, the trial court made more than 200 findings of fact, the majority of which Wood does not dispute in this appeal. We discuss additional facts in the relevant sections below.

## STANDARD OF REVIEW

The United States Constitution protects parental rights as a fundamental liberty interest.[4] To terminate a parent's rights, the Department must satisfy a two-pronged test.[5] The first prong requires proof of the six factors described in RCW 13.34.180(1).[6] The Department must prove these factors by clear, cogent, and convincing evidence.[7] Clear, cogent, and convincing evidence exists when the evidence shows that an ultimate fact in issue is highly probable.[8] If the Department satisfies the first prong, the court proceeds to the second prong, determining whether termination is in the child's

---

[4] Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

[5] In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011).

[6] RCW 13.34.180(1) requires the Department to prove (a) the child has been found to be a dependent child; (b) the court has entered a dispositional order pursuant to RCW 13.34.130; (c) the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency; (d) the services rendered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided; (e) there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and (f) continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

[7] K.N.J., 171 Wn.2d at 576-77.

[8] In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995).

best interests.[9] The Department must prove this second prong by a preponderance of the evidence.[10]

If substantial evidence supports the trial court's findings, we must affirm the termination order.[11] "'[E]vidence is substantial if, when viewed in the light most favorable to the party prevailing below, it is such that a rational trier of fact could find the fact in question by a preponderance of the evidence.'"[12] In this review, we do not make credibility determinations or weigh the evidence.[13] "Deference paid to the trial judge's advantage in having the witnesses before him [or her] is particularly important in deprivation proceedings."[14] We consider unchallenged findings as true on appeal.[15]

## ANALYSIS

### All Necessary and Available Services[16]

Wood alleges that by not tailoring services to accommodate her cognitive and developmental disabilities,[17] the Department failed to prove that it offered or provided her all reasonably available, necessary services capable of correcting her parental deficiencies within the foreseeable future. We disagree. Though the Department must

---

[9] RCW 13.34.190(1)(b).

[10] In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).

[11] In re Dependency of T.R., 108 Wn. App. 149, 161, 29 P.3d 1275 (2001).

[12] In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003) (alteration in original) (quoting In re Dependency of M.P., 76 Wn. App. 87, 90-91, 882 P.2d 1180 (1994)).

[13] In re Welfare of C.B., 134 Wn. App. 942, 953, 143 P.3d 846 (2006).

[14] In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

[15] In re Dependency of J.M.R., 160 Wn. App. 929, 939 n.5., 249 P.3d 193 (2011).

[16] This issue encompasses Wood's challenge to findings of fact 2.181, 2.182, 2.189, 2.208, and 2.209.

[17] Wood has a reported IQ of 64. In school, she was enrolled in special education classes. She did not complete high school and never earned a diploma or General Equivalency Degree (GED).

prove it offered services specifically tailored to the individual parent's needs,[18] it is not obligated to offer additional services that might have been helpful if the parent is unwilling or unable to make use of available services.[19] The Department is not required to offer or provide services that would be futile.[20]

For the first time on appeal, Wood argues that the Department was statutorily obligated to consult with its Developmental Disabilities Administration (DDA) to coordinate a tailored service plan for accommodating her specific cognitive limitations, but it failed to do so.[21] A review of the record shows that Wood did not raise this issue before the trial court.

Generally, we will not consider issues raised for the first time on appeal. However, a "party may raise for the first time on appeal a manifest error affecting a constitutional right."[22] The appellant has the burden of demonstrating the basis for reviewing an issue for the first time on appeal.[23] Here, Wood fails to address RAP

---

[18] In re Dependency of D.A., 124 Wn. App. 644, 651, 102 P.3d 847 (2004).

[19] In re Dependency of Ramquist, 52 Wn. App. 854, 861, 765 P.2d 30 (1988).

[20] "'Where the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services.'" In re Welfare of C.S., 168 Wn.2d 51, 56 n.2, 225 P.3d 953 (2010) (quoting In re Welfare of M.R.H., 145 Wn. App. 10, 25, 188 P.3d 510 (2008)).

[21] See RCW 13.34.136(2)(b)(i)(B). Similarly, amicus curiae Disability Rights Washington argues that the Department failed to discharge its duty to consult with DDA as to the provision of tailored services to address Wood's intellectual disabilities before terminating her parental rights.

[22] In re Adoption of M.S.M.-P., 181 Wn. App. 301, 312, 325 P.3d 392 (2014) (citing RAP 2.5(a)(3)). "A manifest error requires a showing of actual prejudice." M.S.M.-P., 181 Wn. App. at 312. Actual prejudice requires a "plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case." State v. Lynn, 67 Wn. App. 339, 345, 835 P.2d 251 (1992).

[23] State v. Grimes, 165 Wn. App. 172, 185-86, 267 P.3d 454 (2011).

2.5(a) and offers no basis for reviewing her DDA consultation claim for the first time on appeal. She has not met her burden.

Wood also argues that "[a]lthough the Department provided several different services, and although [she] engaged in some . . . her inability to [make] progress was due to the lack of accommodation of her disability." Contrarily, the record shows that Wood did not trust the Department and refused to work with the Department regardless of the type and number of services offered or provided.

In January 2016, the Department referred Wood to parenting classes. Although Wood began to attend the classes, she was terminated because of too many absences. The Department re-referred Wood to parenting classes in May 2016, but she did not attend.

In May 2016, the Department referred Wood to Dr. Walker for a psychological evaluation with a parenting component. Wood attended the first session with Dr. Walker but began throwing chairs around in the waiting room and frightened staff with her behavior. Dr. Walker refused to work with Wood any further after this incident. The Department then referred Wood to Dr. O'Leary for the same evaluation, but she missed the appointment, and Dr. O'Leary refused to work with her. Finally, in December 2016, the Department referred Wood to Dr. Swing for a psychological evaluation and parenting component. It took Dr. Swing five months to get Wood in for an appointment.[24] Wood did not work cooperatively with Dr. Swing and did not fully

---

[24] The Department and Dr. Swing made numerous efforts to get Wood to Dr. Swing's office. Wood "failed to appear for some appointments, refused others, and did not respond to some other offered dates."

- 7 -

complete Dr. Swing's evaluation. Notably, Wood refused to take the Wechsler Adult Intelligence Scale, 4th edition, which is an assessment tool Dr. Swing sought to use in assessing Wood's current intellectual functioning.

Also in May 2016, the Department referred Wood to Compass Health for a mental health assessment and counseling. From May to December 2016, she attended only six counseling sessions even though she was authorized to participate in up to four sessions a month. At her last counseling session in December 2016, she was more than three hours late for the appointment and only sought help paying $2,000 in back rent and a $1,140 electric bill. Several months later, the Department referred Wood to another mental health provider, but she declined and said that she would find her own counselor. She never did. The trial court determined that mental health treatment has been offered to Wood repeatedly, but she refused to go.

In September 2016, the Department referred Wood to Positive Parenting Program (Triple P) for parent coaching. Because Wood's visitation of her children was so inconsistent at that time, the Triple P provider could not work with Wood and, instead, recommended Family Preservation Services (FPS) as an appropriate service for parent coaching. The Department referred Wood to an FPS provider in June 2017. However, Wood ultimately refused to work with the FPS provider despite the provider's multiple attempts and methods of doing so. The FPS provider testified that during a telephone call, Wood stated "she was intentionally ignoring me because she was not comfortable working with me, knowing that . . . I would be sharing information with her social worker."

In April 2017, Wood received referrals for random UAs and a drug and alcohol evaluation. She never completed either service. In September 2017, Dr. Swing recommended that Wood receive job training through the Division of Vocational Rehabilitation. The Department offered Wood a referral, but she refused the service.[25]

The Department and the FPS provider offered Wood housing information and resources. At trial, however, Wood testified that she still did not have housing appropriate for reunification with her children and acknowledged that the children could not return to her care until she located appropriate housing.

Wood repeatedly confirmed that she had "a lot of trust issues with the Department" and limited the extent to which she engaged or cooperated with service providers recommended by the Department. She indicated an unwillingness to work with any service provider who would later report back to the Department. The trial court's unchallenged finding of fact 2.191 establishes that Wood "has refused to work with providers who would provide information to the Department. Although she testified on cross-examination by her own lawyer that she would engage in services, such testimony was weak and not credible."[26] The trial court also found, in pertinent part:

---

[25] Dr. Swing also recommended other services for Wood, including a domestic violence support group, Parent-Child Interaction Therapy (PCIT), and Eye Movement Desensitization and Reprocessing (EMDR) treatment. The Department referred Wood to Project Aware for domestic violence victims, and Wood attended the support group. However, the Department was unable to offer PCIT to Wood due to the inadequate amount of time she had with her children. Similarly, the Department was unable to offer Wood EMDR services due to lack of providers in her area and because Wood needed to engage in a minimum of six months of general counseling treatment prior to engaging in EMDR treatment.

[26] Furthermore, Wood does not dispute finding of fact 2.204 ("The mother has a profound distrust of the Department. The mother will not work towards fixing things.") or

2.181 To the degree that the mother suffers cognitive impairment, the Department made efforts to accommodate the mother's impairments. The mother was offered interactive parenting education. The mother received extra assistance from the social worker with making appointments, making phone calls, and making transportation arrangements. The social worker tried very hard to explain things to the mother in a variety of ways. The social worker ensured that information was provided both by herself as well as by the mother's Office of Public Defense social worker.

2.182 So all of the court-ordered and necessary services capable of correcting parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

. . . .

2.189 Additionally, it's very clear beyond the required standard of clear, cogent, and convincing evidence that making any future referrals of any kind including re-referring anything and everything that has already been done, is futile.

. . . .

2.208 Even if the mother were to engage in services and achieve the best possible progress, the near future for these children is outside of the two years that it would take to reunify these children with their mother.

2.209 There is little likelihood that conditions will be remedied so that the child can be returned to the parents [sic] in the near future.

In view of this record, it is apparent that Wood's lack of progress stems from her distrust of the Department and her failure to participate fully in the services offered. Substantial evidence supports the trial court's findings that the Department offered or provided all necessary and reasonably available services capable of correcting parental deficiencies within the foreseeable future and that any additional service referrals would be futile.

---

finding of fact 2.205 ("The mother's assertions at trial that she would now be willing to work with the Department were weak, hollow, and just not credible.").

Wood relies on In re Parental Rights to I.M.-M.[27] as further support of her argument on this issue. Her reliance on I.M.-M. is misplaced. In I.M.-M., the mother promptly completed a court-ordered psychological evaluation that showed she had significant cognitive impairment impacting her ability to succeed in services. There, the record demonstrated that additional services would not be futile. In I.M.-M., the mother showed a willingness to engage with the Department and

> made notable efforts to engage in services and work with her providers. She promptly obtained a mental health evaluation, a chemical dependency evaluation, and a parenting assessment, as requested by the Department. Despite being homeless, [the mother] kept in basic touch with her social workers. She engaged in various types of recommended services, including mental health therapy that was "pretty consist" over the course of two years. [The mother] also regularly participated in visitations with her children up until the very end of the dependency.[28]

Unlike the mother in I.M.-M., Wood did not promptly or diligently participate in many of the services offered, Wood utterly refused to participate in others, Wood did not regularly participate in visits with her children, and Wood did not make any progress in improving her parental deficiencies in more than two years.

*Neuropsychological Evaluation*[29]

The trial court found that "Dr. Swing agreed that a neuropsychological evaluation could possibly provide some useful information, but no additional service recommendations would flow from it" and that "[a] neuropsychological evaluation was not a necessary service." Wood argues that the trial court erred in entering these

---

[27] 196 Wn. App. 914, 385 P.3d 268 (2016).
[28] I.M.-M., 196 Wn. App. at 925 (footnote and citation omitted).
[29] This issue encompasses Wood's challenge to findings of fact 2.177, 2.178, 2.182, and 2.197.

findings, as well as related findings that all necessary services have been offered,[30] because these findings are not supported by substantial evidence. This argument is unpersuasive.

The record establishes by clear, cogent, and convincing evidence that a neuropsychological evaluation was not a necessary service under the circumstances. The unchallenged findings of fact establish:

2.170 A neuropsychological evaluation was not court ordered and was never recommended as a service.

2.171 Dr. Swing did not recommend a neuropsychological evaluation in her September [2017] report.

2.172 Dr. Swing reviewed as collateral information a psychological evaluation previously completed . . . that the mother had previously been diagnosed with an IQ of 64.

2.173 Dr. Swing attempted to assess the mother's current cognitive functioning, but the mother refused to engage in the necessary testing.

2.174 Based on her observations of the mother's functioning, Dr. Swing diagnosed the mother's intellectual impairment as less severe as prior evaluators.

2.175 Dr. Swing noted that the mother seemed to operate at a higher level than her old I.Q. scores would indicate.

2.176 Dr. Swing did not recommend a neuropsychological evaluation because it was not apparent to her that it was needed.

---

[30] These related findings include finding of fact 2.182 ("So all of the court-ordered and necessary services capable of correcting parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.") and finding of fact 2.197 ("Services ordered under RCW 13.34.136 have been expressly and understandably offered or provided, and all necessary services reasonably available, capable of correcting the parents' [sic] parental deficiencies within the foreseeable future, have been expressly and understandably offered or provided to the parents [sic].")

At trial, Dr. Swing testified that Wood "didn't show the same level of impairment with someone who I would—or who I would traditionally think of operating at an I.Q. of below 70" and that while Wood has "impairments in functioning in many areas, it seems . . . more related to psychological and emotional difficulties than it is cognitive difficulties in and of itself."

The trial court's finding that a neuropsychological evaluation was not a necessary service is supported by substantial evidence. Additionally, as previously indicated, substantial evidence also supports the finding that an offer of any additional services to Wood, such as a neuropsychological evaluation, would have been futile.

*Best Interests of the Children*[31]

Next, Wood disputes the trial court's determination that termination is in her children's best interests. She points to evidence that supports a strong, loving bond between her and the children.

We consider the facts and circumstances of each individual case to determine the child's best interests.[32] Therefore, we place a "'very strong reliance on trial court determinations of what course of action will be in the best interests of the child.'"[33] Without question, "a child has the right to basic nurturing, which includes the right to a safe, stable, and permanent home and the speedy resolution of dependency and

---

[31] This issue corresponds to Wood's challenge to findings of fact 2.208, 2.209, 2.219, and 2.220.

[32] In re Dependency of A.V.D., 62 Wn. App. 562, 572, 815 P.2d 277 (1991) (citing Aschauer, 93 Wn.2d at 695).

[33] In re Pawling, 101 Wn.2d 392, 401, 679 P.2d 916 (1984) (quoting In re Welfare of Todd, 68 Wn.2d 587, 591, 414 P.2d 605 (1966)).

termination proceedings."[34]   If the child's rights conflict with the parent's rights, the child's rights should prevail.[35]

Wood does not dispute the trial court's finding of fact 2.214:

[The children] have already been out of home for two years.  Reunification is at least another two years away.  If the mother fully engaged, it would be six to nine months to begin to show progress.  These three children can no longer wait for their mother to learn to parent.

She also does not dispute the court's finding that she was unaware of her children's many special needs or finding of fact 2.218: "Continuation of the parent-child relationship clearly diminishes the child[ren]'s prospect for early integration into a stable and permanent home."  We accept these findings as true.  Further, Wood testified that she was no more prepared to take her children home at the time of trial than she was on the day she agreed that her children were dependent.

"Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period'" while the parent attempts rehabilitation.[36]   While Wood has expressed genuine love for her children, she has not shown progress in addressing her parental deficiencies.  Accordingly, the preponderance of the evidence supports the trial court's best interests finding.

---

[34] T.R., 108 Wn. App. at 154 (citing RCW 13.34.020).
[35] RCW 13.34.020.
[36] T.R., 108 Wn. App. at 167 (quoting In re A.W., 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

- 14 -

*Trial Court's Personal Animus*

Lastly, Wood argues that the trial court "erred when it permitted its personal animus against the mother to permeate its findings of fact." As purported examples of this animus, Wood points to finding of fact 2.193 (finding the mother is "poorly educated, has at the age of 28 never held a job of any kind for any period, and apparently has no interest in doing so") and finding of fact 2.195 (finding the mother "has utterly no interest in learning"). Wood claims that in light of her developmental disabilities, these findings detract from the trial court's appearance of fairness and impartiality.

We presume that a trial court performs its duties without bias or prejudice.[37] The party claiming bias or prejudice must support the claim with evidence of the trial court's actual or potential bias.[38]

The findings Wood cites are not evidence of the trial court's actual or potential animus. Rather, these findings are summaries of Wood's trial testimony. For instance, when asked why she had never worked, Wood answered, "I hadn't really thought about it." Later, when asked if she would be willing to cooperate with the Department to get some job training or skills, Wood answered: "I am not." Wood also testified she was unaware of any special needs that her children may have and expressed a belief that "they're typical . . . kids"[39] but did not otherwise testify to learning more about any perceived special needs of her children.

---

[37] In re Marriage of Meredith, 148 Wn. App. 887, 903, 201 P.3d 1056 (2009).

[38] State v. Dominguez, 81 Wn. App. 325, 328-29, 914 P.2d 141 (1996).

[39] However, the trial court's uncontested finding of fact 2.194 establishes that the children are not typically developing: "The mother claims to have no awareness of any special needs of any of her children. . . . In the face of evidence that her own children

Upon review of the record and context in which the trial court made these findings, Wood has not produced evidence that would lead a reasonable person to believe the trial court was biased in any way. Wood's animus claim lacks merit.

## CONCLUSION

Substantial evidence supports the trial court's determination that the Department offered or provided Wood with all reasonably available services capable of correcting her parental deficiencies in the foreseeable future and that a neuropsychological evaluation was not a necessary service. Any additional services offered to Wood would have been futile. Substantial evidence also supports the trial court's finding that termination of Wood's parental rights to S.R.P.W., K.R.T.W., and K.R.-K.W. is in their best interests. We affirm.

_Leach, J._

WE CONCUR:

---

are, in fact, in need of a great deal of help in many spheres, she testified that they are typical kids."