**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Welfare of:<br><br>D.H. and A.K.,<br><br>                         Minor children. | No. 56402-5-II<br>(consolidated with No. 56409-2-II)<br><br>PUBLISHED OPINION |

CRUSER, A.C.J.—AH is the mother of two children, DH and AK, both of whom were removed from her care at birth. DH was born in 2016 and AK was born in 2020. AH's parental rights as to both children were terminated in 2021, a decision she challenges in this appeal, arguing that the Department of Children, Youth, and Families (Department) failed to present sufficient evidence showing it tailored its services to her intellectual disability.

Upon a Department-provided neuropsychological evaluation, AH was diagnosed in 2017 with a developmental disability. Specifically, her cognitive abilities are in the second percentile and her executive functioning is below the first percentile. She also presented with below average language function and was assessed to be at risk for certain problematic parenting beliefs. Upon diagnosing her disability, the Department-selected psychologist recommended certain services be provided to AH, but did not make recommendations about how best to communicate with her when offering those services. The Department's social workers were not trained in the current guidelines for disability-friendly communication, but they each reviewed the psychologist's report. Upon

No. 56402-5-II
Consolidated No. 56409-2-II

referrals made by her social workers, AH engaged in three parenting education courses as well as the coaching intervention Family Preservation Services (FPS). Most of AH's service providers were not trained in disability-friendly communication when they worked with her. Nor was the trial court presented with evidence of the current professional guidelines for communicating with disabled individuals. Nonetheless, the court concluded that AH's offer of services was sufficiently tailored to her needs.

Because the court did not have information about current professional guidelines with which to compare the communication that AH actually received, it did not have sufficient evidence to conclude that communications were sufficiently tailored. For the same reason, it also lacked sufficient evidence to conclude that a properly tailored offer would have been futile. We therefore reverse the order terminating AH's parental rights.

FACTS

I. BACKGROUND: REMOVAL AND DEPENDENCY PROCEEDINGS

AH is the mother of two children, DH and AK, both of whom were removed from her care at birth. DH was born in December 2016 and AK was born in November 2019. AH's parental rights were terminated[1] as to both children in October 2021, a decision AH challenges here.

DH was initially removed from AH's care due to "concerns that [AH] was unable to provide for his basic needs." 1 Verbatim Report of Proceedings (VRP) (Aug. 16, 2021) at 26. DH was thereafter placed in foster care and entered a dependency in March 2017. In March 2018, AH was ordered to complete the following services:

---

[1] The parental rights of the children's fathers were terminated separately and are not at issue in this appeal.

2

No. 56402-5-II
Consolidated No. 56409-2-II

1. Department approved parenting class or instruction;
2. Complete neuropsychological evaluation and follow recommendations;
3. Complete mental health assessment and follow recommendations;
4. Domestic violence victim support or services;
5. Sign releases and immediately inform the Department of any barriers [i]n accessing services.

Exs. (Vol. I) at 87 (emphasis in original). AH's court ordered services were altered on December 12, 2019, when the court removed the neuropsychological evaluation from its order and clarified that "this is not a court ordered or necessary service. It was not recommended in her psychological evaluation and was eliminated as a service by the court on June 6, 2019." *Id. at* 181. In July 2020, the court amended AH's list of court ordered services in DH's dependency to read:

1. Department approved parenting class or instruction through Developmental Disability Administration (DDA);
2. **COMPLETED**: Complete mental health assessment and follow recommendations;
3. Mental health treatment recommended in #2 above;
4. **PARTIAL COMPLETION**: Complete an updated psychological assessment
5. Domestic violence victim support or services;
6. Engage in all services that are available with Developmental Disability Administration.
7. Sign releases and immediately inform the Department of any barriers in accessing services.

*Id.* at 226 (emphasis in original). In January 2021, the first ordered service related to DH's dependency was altered to add the additional option of taking a parenting class "with [an] instructor trained in working with parents with developmental disabilities." *Id.* at 250. The third service was clarified to refer to individual therapy.

The court did not, at the time of AK's removal in 2019, order AH to participate in any additional services. *Id.* at 154 (crossing out "shall" and writing in "may"). In October 2020, AK's dependency was entered and AH was thereafter ordered to complete the same services that were

3

No. 56402-5-II
Consolidated No. 56409-2-II

ordered in DH's dependency. In June 2021, the Department moved to remove domestic violence

support services from AH's court ordered services and replace it with "Domestic Violence Victim

Panel." *Id.* at 269. Correspondingly, the court removed domestic violence victim support services

and instead ordered AH to complete a four-hour online class on July 10, 2021.

## II. CASE WORKERS ASSIGNED TO COMMUNICATE WITH AH

AH worked with three social workers during the course of DH and AK's dependencies:

Tessica Welch, Corissa Beairsto, and Colleen Rice-Lozensky. First, Welch was assigned to DH's

case from January 2017 to December 2017. The record does not indicate that Welch was trained

in working with individuals with disabilities. She met in person with AH four times during her

tenure on the case and did not observe visitation between AH and DH. When Welch met with AH,

AH's grandmother was usually present. Welch primarily kept in contact with AH by calling AH's

grandmother and leaving her messages to pass along to AH, and by sending mail to AH's

grandmother's address. For example, Welch sent AH a letter notifying her of an upcoming meeting

by stating,

> You are cordially invited to attend as your voice and guidance is important to us as
> we gather information for the court as to the future of this child. The purpose of this
> meeting is to identify a permanency planning goal that will either return the child
> home to the parent or develop a permanent plan for placement.

*Id.* at 335.

AH's second social worker, Beairsto, was assigned as AH's new social worker in

December 2017. Beairsto was aware when she began working with AH that AH had a

developmental disability. There is no indication in the record that Beairsto was trained in working

with individuals with disabilities or familiar with professional guidelines on disability-friendly

4

No. 56402-5-II
Consolidated No. 56409-2-II

communication. Beairsto sent AH a letter that listed AH's parenting deficiencies as "1) [u]nable to provide a safe and appropriate home environment" and "2) [m]ental [h]ealth concerns which interferes [sic] with the ability to safely and appropriately parent," which Beairsto later discussed line-by-line with AH. 1 VRP (Aug. 16, 2021) at 117. Beairsto's letter also detailed her court ordered services but did not explain why it was important to engage in services or the consequences of failing to engage.

AH's third social worker, Rice-Lozensky, took over the case in March 2018. Rice-Lozensky had training in the form of "a class or two" on special education, as part of the undergraduate degree she received in 1980, but the record does not indicate she was familiar with current guidelines for communicating with individuals with disabilities. 2 VRP at 459. When working with AH, Rice-Lozensky "[u]sually" wrote down important information. *Id.* at 556. Rice-Lozensky communicated with AH through letters and "talk[ed with AH] about" AH's deficiencies and the offer of services. *Id.* at 488. For example, Rice-Lozensky sent a letter to AH that began,

> I am sending this letter regarding your court ordered Services in Lewis County, as well as your parental deficiencies. The recommended services are: to complete a parenting class such as Triple P - or Parenting Classes at the local community college, complete a psychological evaluation and follow all recommendations, to obtain domestic violence victim support/services, to engage in all services that are available with Developmental Disability Administration, to obtain a mental health assessment and follow through on all recommended treatment, to sign releases of information for all providers, and contact the Department regarding any barriers in accessing services. Your parental deficiencies include an inability to protect the child from unsafe people as well as domestic violence exposure which harms the child's psychological well-being, an inability to provide a safe and appropriate home environment, and an inability to appropriately parent and meet the child's basic as well as developmental needs.

Exs. (Vol. I) at 341. In another letter, Rice-Lozensky also wrote,

5

No. 56402-5-II
Consolidated No. 56409-2-II

> Although I have a standing appointment with you every third Friday of the month at 11:15 a.m., and I want to hear from you at that time at a minimum, please also feel free to call me or visit me at any time at [phone number] so we can make arrangements or phone calls to assist you with getting the services arranged and completed.

*Id.* at 345. Other letters were similarly written and instructed AH of steps to take and individuals to contact for court ordered services.

### III. SERVICES OFFERED

A. Neuropsychological Evaluations

AH was evaluated by Dr. Steve Tutty first in 2017, then again in 2020, with an additional parenting observation performed in 2021. Dr. Tutty, MA, PhD, is a clinical psychologist specializing in child, forensic, and neuropsychology. Tutty has experience[2] diagnosing cognitive impairments and intellectual disabilities. He is familiar with the current professional guidelines for working with people with intellectual disability. Tutty has frequently served as an expert in dependency matters since 2011.

According to Tutty's 2017 evaluation, AH's cognitive ability[3] was in the second percentile. Further, AH scored below the first percentile in an assessment of attention and executive

---

[2] Tutty's CV indicates that his experience with executive functioning deficits like ADHD and autism have been focused on these disorders' presentation in children and adolescents. However, he is working on a forthcoming publication about the impact of executive functioning deficits on parental functioning.

[3] Cognitive ability refers to "the ability to problem solve or the ability to form decisions, to reason." 1 VRP (Aug. 18, 2021) at 231.

6

No. 56402-5-II
Consolidated No. 56409-2-II

functioning[4] deficits. AH was also found to be moderately impaired in her "ability to regulate responses and respond appropriately," especially when responding to auditory stimuli. *Id.* at 379. She was severely impaired in her attention, especially auditory attention, "indicating that her auditory attention is likely to trail off considerably, which can impact parental monitoring and responsiveness." *Id.* at 380. AH's language and motor function were also found to be below average. Tutty also found that AH was at high risk for poor parenting using "low levels of empathy," "reverse family roles," "inappropriate developmental expectations," and "restricting power and independence." *Id.* at 383. From these results, Tutty "concluded that the parental risk factors are -- are high with respect to safety and the welfare of her child . . . because of the cognitive and executive functioning impairments." 1 VRP (Aug. 18, 2021) at 233.

In light of AH's test results, Dr. Tutty made several recommendations with respect to services in 2017. First, he recommended that AH complete "a Department approved parenting class akin to the Incredible Years program" to be followed by six to eight visits with a parenting coach who would be "assigned to reinforce parenting skills taught in this program during supervised visits." Exs. (Vol. I) at 386.

Second, he recommended that AH or her service providers "record specific care instructions and routines for her child on paper and post it visually in the home" to help "cue her memory" as to various parenting skills and routines. *Id.* Third, he recommended that AH "explore a psychotropic medication that can target and improve [her] executive functioning deficits." *Id.*

---

[4] Executive functioning refers to "planning, monitoring, organizing, it relates to attention, focus, the ability to shift back and forth between distinct topics, such as multitask" as well as "retain[ing] and retriev[ing] information." 1 VRP (Aug. 18, 2021) at 231-32.

No. 56402-5-II
Consolidated No. 56409-2-II

Fourth, he recommended that AH contact the department of developmental disabilities and "inquire about the help and resources available" to her through that department. *Id.* Tutty's recommendations did not refer to any professional guidelines or explain how best to communicate with an individual with AH's cognitive ability.

Tutty evaluated AH again in 2020, and this time Tutty was asked "[t]o make sure that all assessments, evaluations, and recommendations take into account [AH]'s developmental disability so that [AH] is able to understand and process all of the information." *Id.* at 392. AH's scores were similar to her 2017 results with respect to her executive function and parenting attitudes. However, tests assessing her cognitive ability and language functioning were not repeated. Dr. Tutty concluded "that her parental beliefs have not shifted despite the interventions the Department and other service providers have provided to her over time." *Id.* at 415. He also concluded that AH "does not appear to be amenable to treatment by virtue of the clinical and parenting deficits identified that have not improved over time" and that AH "remains at a high risk toward adversely affecting the safety and welfare of her children at this time and in the near future." *Id.* at 401.

Tutty's first two reports did not include any observation of AH with her children. In 2021, Dr. Tutty observed AH with her children via Zoom to complete a third evaluation. He found that AH "was aware of the safety and surroundings" and that she "maintained close proximity to [AK]" and "engaged [DH] with toys and snacks." *Id.* at 416. He also observed AH as "playful and active with her children" and "reinforced her children's cooperative play." *Id.* Further, Tutty noted that "her children appeared to be comfortable in the presence of [AH] and did not manifest any signs of an insecure attachment" and that "[AH] appeared to manifest some positive parenting traits during the parent child observation." *Id.* at 417-18. Although he did not recommend reunification,

8

No. 56402-5-II
Consolidated No. 56409-2-II

Tutty concluded that "[i]t may be prudent to explore an open adoption so that [AH] could maintain contact with her children across their development." *Id.* at 418.

AH's social workers each reviewed Tutty's 2017 report. The social workers also provided the report to most of AH's service providers.

B. Parenting Instruction

*1. Promoting First Relationships*

AH participated in the Promoting First Relationships (PFR) parenting course from July to September 2017. "This 90-day course covered topics related to caring for both the intangible and tangible needs of an infant." Clerk's Papers (CP) at 266. The PFR instructor, Brenda Sullens, was provided with Dr. Tutty's evaluation and informed that AH was developmentally disabled. At the time, Sullens had no training in working with individuals with disabilities. Because of AH's disability, Sullens "was as concrete as possible" and wrote things down for AH. 1 VRP (Aug. 16, 2021) at 87.

According to Sullens, AH completed the program but did not grasp the concepts it covered. *Id.* at 65. Sullens saw AH as a "concrete person" who was not "at all" able to do things like "think on what their child might be feeling, think on what they might be going through, reflect on what the social and emotional need might be." *Id.* Sullens also believed that "coming back and being able to think through . . . and retain information that had been given in the beginning of the curriculum" was "not something that she appeared to be capable of." *Id.* at 67. Sullens further stated that "she doesn't have the capacity to be reflective" and because of that, "there wasn't a real connection to what the [PFR] program was about." *Id.* at 73.

9

No. 56402-5-II
Consolidated No. 56409-2-II

Sullens also found it "problematic" that AH "would rely on promptings" when adjusting to her child's changing developmental stages. *Id.* at 75. But Sullens also noted that "[s]he was able to adapt after she was given the information. So if -- if the visit supervisor said we're now providing -- you know, giving him solids, then tell her she needed to start bringing solids, she would do that. It was not something she initiated on her own, but it was something she was able to adapt to, yes." *Id.* at 93.

*2. Project Safe Care*

AH participated in Project Safe Care for four months beginning in March 2018. This was again taught by Sullens. AH's social worker at the time, Beairsto, chose the program because "the service provider [Sullens] had previously worked with [AH] . . . . So she had already been aware of the concerns regarding [AH]'s cognitive abilities and so I chose to go ahead and use her again, since she was familiar." *Id.* at 103-04. Sullens also believed this course would better suit AH's concrete thinking style.

Beairsto also felt that Safe Care was a better fit for AH compared to the Incredible Years program that Dr. Tutty recommended because "Incredible Years is also -- the curriculum is classroom based, for the most part. We really didn't have an availability at that point for Incredible Years, here with classroom based instruction. And, then, the learnings that you get in it is [sic] videos and being able to reflect on what you learned and it's not as one-on-one as what Safe Care was and I felt that would be better, specifically for [AH]." *Id.* at 110-11. Sullens was trained in the Incredible Years program, but she did not offer it to AH.

During the assessments that make up part of the Safe Care curriculum, AH "was not able to use what we had learned . . . and start putting it into practice with [her] child." *Id.* at 83. For this

10

No. 56402-5-II
Consolidated No. 56409-2-II

reason, AH did not reach "mastery" of the health skills module within Safe Care. *Id.* at 84. Nonetheless, Sullens "made the decision and let the social worker know that we're just moving forward [with further modules]." *Id.* Sullens reasoned, "We're not going to hit mastery or success, but I would like for her to be able to have completion of the program." *Id.* Going forward, Sullens observed that "for the most part there wasn't a building from week to week." *Id.* Sullens also noted that AH did not tend to make eye contact or respond to DH's smiles.

*3. TIPS / Level Up Parenting*

AH's final parenting course was Level Up Parenting, a ten-week course she began in April 2019 through Centralia Community College. AH was initially referred to the college's TIPS course, but "she missed getting into" that course. 2 VRP at 490. By the time AH was able to enroll, TIPS was "renamed to Level Up Parenting," although "there were a few differences" after the course changed names. *Id.* at 490, 544. Rice-Lozensky chose TIPS for AH for four reasons: children were included in the course, parents in the course received a binder of parenting instructions, the course is delivered at a slow pace, and AH's mother had successfully completed this class. During Level Up, a classroom-based course, AH took notes, turned in her homework, and was engaged in the class.

*4. Family Preservation Services*

In addition to her parenting courses, AH was referred to FPS in March 2018, December 2018, and December 2020. Beairsto placed the first referral in March 2018. Beairsto chose FPS because it "can really be tailored to a parent regarding what specific goals you would like to get help with." 1 VRP (Aug. 16, 2021) at 106. To that end, FPS is "a little bit less one-on-one parenting instruction and more parent support to connect them to things that you feel like they need assistance

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56402-5-II
Consolidated No. 56409-2-II

with or their court ordered service was as well." *Id.* After entering the referral, Beairsto helped the

FPS provider, Parentaeu, get in touch with AH by calling, texting, and visiting AH's home, then

arranging a meeting at the CPS office. Parenteau observed one of AH's visits with DH in March

2018, and noted that "[DH] and [AH] seem to be attached. [AH] seems to be in tune with [DH]'s

needs." Exs. (Vol. II) at 19. This referral was eventually terminated due to nonresponse.

AH's second FPS referral, in December 2018, was picked up by Teresa Williams. Williams

is not sure if she was informed of AH's disability until "later on" when she reviewed Dr. Tutty's

report. 1 VRP (Aug. 18, 2021) at 337. After learning of AH's disability, Williams "worked slower

and provided more information." *Id.* As AH's FPS provider, Williams met with AH once or twice

per week for at least an hour. These meetings involved observing AH's visits with DH and assisting

her with her parenting skills. For example, Williams noticed AH bringing "sweets and sugary

foods" to visits and thereafter "provided a paper for her on nutrition for a two-year-old and fruits,

vegetables." *Id.* at 341. Williams noticed that even after receiving this information, AH would

continue to bring sweets for DH. But eventually, "[s]ome of the food choices, yes, were better."

*Id.* at 346. Williams reported in December 2018 that "[AH] appears to be bonded with [DH] and

she demonstrates the skills of positive praise, explaining what she is doing, and I have observed

[AH] redirecting [DH] while playing. There have been no barriers to engagement." Exs. (Vol. II)

at 41.

AH's third referral, in December 2020, was also fulfilled by Williams who provided FPS

services from January 2021 to April 2021. Before working with AH for the second time, Williams

received training on working with people with developmental disabilities. She learned that

"[p]eople with disabilities . . . can still learn. But they learn at maybe a slower pace or in a different

12

No. 56402-5-II
Consolidated No. 56409-2-II

method. Like providing visuals or other information." 1 VRP (Aug. 18, 2021) at 354. Still, the record does not indicate that Williams provided visuals, but instead she "provided information for her and went over it and explained in detail and provided examples." *Id.* Williams found that the second time she worked with AH, she retained information "somewhat" better than the first time. *Id.* at 356. AH also improved by bringing more nutritious snacks during this round of FPS. Still, Williams noticed AH was "overwhelmed . . . with one [child] going one way and one trying to go another way." *Id.* at 361. Finally, Williams reported that AH's attachment with AK improved over the course of this intervention.

C. Psychological Assessment, Counseling, and Medication Management

*1. Psychological Assessment and Counseling*

AH's first social worker "provided information on where she could complete an evaluation for mental health services." *Id.* at 38. Later, AH's second social worker, Beairsto, referred AH for a mental health evaluation in February 2018. After this referral, AH's mental health intake was conducted by Deborah Ingram of Cascade Mental Health, with whom AH shared information about past trauma. The intake and diagnosis process was not done any differently than it would be for a client without intellectual disability. Ingram "did not come up with a diagnosis" upon her evaluation of AH, meaning that she "did not find any mental health conditions that we could treat at that time." *Id.* at 187.

Later, AH's third social worker, Rice-Lozensky, referred her to Deb Darnell for an additional psychological evaluation and services. Darnell worked with AH from December 2020 until she lost contact with AH in February 2021. Rice-Lozensky believed Deb Darnell was a good

No. 56402-5-II
Consolidated No. 56409-2-II

fit for AH's mental health services "because Deb Darnell had so much knowledge of her family." 2 VRP at 532.

Prior to seeing AH, Darnell had "worked with six of [AH's] siblings off and on for six years." *Id.* at 418. Darnell was therefore aware of the neglect and sexual abuse that AH's siblings had been through, as well as their "intense sexual behaviors," "acting out, violent things," and "very significant symptoms of, like, trauma." *Id.* at 423-24. AH did not want to work with Darnell because of this history, which AH viewed as a conflict of interest. Rice-Lozensky, on the other hand, did not view Darnell's prior work with the family as a conflict of interest.

Upon Rice-Lozensky's referral, Darnell conducted an intake interview with AH, where she observed that AH experienced "[a] lot of anxiety." *Id.* at 419. Darnell's "clinical diagnosis was based on [her] observance of [AH] . . . [b]ut also from the evaluation that I read from Dr. Tutty around deficits." *Id.* Darnell is not trained in performing assessments like the ones contained in Tutty's report, but she does use them to inform her diagnoses. Darnell believed AH was a trauma survivor but "did not get a chance" to perform a trauma assessment while working with her. *Id.* at 434. This belief was based on what AH told Darnell about her childhood exposure to violence and intimidation within the family.

When Darnell evaluated AH, she observed that AH "really presented not knowing why she was there and not really wanting to be there." *Id.* at 420. Darnell believed that AH's "confusion about why she was there" showed a "lack of understanding about the magnitude of what was happening for her." *Id.* at 424-25.

AH and Darnell lost contact when AH sent Darnell several texts and Darnell responded only intermittently. This occurred after they had two sessions; the first was 60 minutes and the

14

No. 56402-5-II
Consolidated No. 56409-2-II

second was 45-50 minutes. Darnell got the sense after her second session with AH that AH might have felt frightened that she had said too much and been too vulnerable.

*2. Medication Management*

Dr. Tutty's report recommended that AH "explore a psychotropic medication that can target and improve [her] executive functioning deficits." Exs. (Vol. I) at 386. AH's first social worker, Welch, "provided [AH] with information" on how to find a provider who could prescribe such medication. 1 VRP (Aug. 16, 2021) at 36. AH's second social worker, Beairsto, referred AH to Cascade Mental Health in part because Cascade could assist with medication management. And AH's third social worker, Rice-Lozensky, referred AH to Darnell, who in turn could have aided AH to find a medication provider if she thought medication would be beneficial, depending on the severity of AH's anxiety. However, AH did not want to take medication. The record does not reflect that any provider discussed specific medication options with AH or that any provider was trained in the ways psychotropic medication could improve executive functioning.

D. Domestic Violence Services

Prior to DH's birth, AH was allegedly hit by DH's father, and a no-contact order was thereafter issued to prevent contact between AH and DH's father. As a result, Welch provided AH with "information on how to contact services for domestic violence victims." *Id.* at 47. Similarly, Rice-Lozensky provided AH with the brochure for Hope Alliance, a local entity that provides domestic violence victim support. Rice-Lozensky tried to help AH engage with Hope Alliance by calling Hope Alliance together with AH, and in that phone call Hope Alliance explained the services they offer. However, AH did not obtain any domestic violence victim support services including from Hope Alliance.

15

No. 56402-5-II
Consolidated No. 56409-2-II

The Department later determined that Hope Alliance was not offering its usual suite of services during the pandemic, so it moved to remove these services from AH's court ordered service list. Instead, Rice-Lozensky recommended that AH view an online domestic violence impact panel that would educate her on the effects of domestic violence on children. AH did not attend the panel that was booked for her.

When Darnell interviewed AH, AH shared that she witnessed domestic violence in her home growing up. Darnell "did not work with [AH] long enough" to understand how this impacted her as an adult. 2 VRP at 428. Darnell had experience aiding domestic violence victims to identify domestic violence in their relationships, as well as "finding supports, gaining confidence [and] assertiveness." *Id.* at 453. Darnell could have aided AH with those skills if needed, had they continued to work together.

E. Developmental Disability Administration (DDA) Services

AH's first social worker, Welch, met with AH in September 2017 to call DDA together; on the phone, DDA informed Welch that AH needed to call back to do an intake interview. AH's second social worker, Beairsto, gave AH a packet to start the application process for services. AH's FPS provider worked with AH's grandmother to fill out the forms, including getting information that AH could not remember.

AH's third social worker, Rice-Lozensky, was heavily involved in coordinating between AH and DDA, and would follow up once or twice a month over several months as well as offering to transport AH for in person assessments. Rice-Lozensky set up a presentation for DDA to explain to AH what services the office provides, because in her experience, people are reluctant to apply for services because they often do not understand what is offered. Rice-Lozensky also helped AH

16

No. 56402-5-II
Consolidated No. 56409-2-II

fill out DDA forms and obtain the records she needed to attach to the forms. After completing the intake process, AH was initially found to be ineligible for DDA services and Rice-Lozensky aided AH to appeal that decision.

On appeal, AH was found eligible for DDA services, but only limited services were available to her. AH did not qualify for DDA's "supportive parenting" services because she did not live with a family member at the time. VRP at 302, 318. The caseworker asked for the family housing requirement to be waived considering many of AH's family members would not be safe to live with, and that waiver request was denied. AH was also denied support in finding secure housing and obtaining a drivers' license. Rather, the only services she was entitled to were "medical transportation and -- and some light housekeeping." *Id.* at 316. Medical transportation entails such services as "setting up an appointment, getting to that appointment, [and] assisting the individual to exchange information in the appointment." *Id.* at 330. AH refused these services because she manages her own home and knows how to do the dishes, and did not need assistance with basic hygiene or bathing.

F. Housing

AH was ordered to obtain safe and stable housing because the Department had concerns about AH living with her mother, Teresa, because some of Teresa's other children had been

17

No. 56402-5-II
Consolidated No. 56409-2-II

removed from her care.[5] AH's first social worker, Welch, "identified housing services in Lewis County, where [AH] was living at the time, and . . . made contact with them and also provided the information to [AH]." *Id.* at 38. Her second social worker, Beairsto, gave her the contact information for a housing resource center. AH also could have accessed housing support through FPS. Rice-Lozensky testified that in 2018 she gave AH a "generic" packet "of general resources in the Lewis County area, including housing," as was her practice "generally." 2 VRP at 547, 531-32. The packet was about half an inch thick.

IV. TERMINATION PROCEEDINGS

On January 31, 2019, before AK was born, the Department petitioned for termination of AH's parental rights as to DH. DH's father voluntarily relinquished his parental rights during the course of the termination proceeding. DH's guardian ad litem (GAL) recommended termination, but noted that "it is obvious [AH] loves [DH]." CP at 15. The Department asked for a continuance on October 1, 2019, because "[AH] is progressing in correcting her parental deficiencies." *Id.* at 50. As a result, the matter was continued until April 2020. Then, due to the COVID-19 pandemic, the matter was again continued until August 2020.

In July 2020, the Department filed an amended petition for termination of AH's parental rights as to DH. It then moved for, and was granted, a continuance to prioritize a fact-finding

---

[5] Although the Department's original dependency petition lists AH's residence as "homeless" at the time of DH's birth, no other evidence points to AH being homeless at any time since her children were born. *See* Exs. (Vol. I) at 25. The remaining evidence suggests AH lived at various times with her mother and other relatives, including with her brother and her aunt. The Department viewed AH's mother and aunt as "unsafe" because both had open CPS cases. 1 VRP (Aug. 16, 2021) at 30. At the time of the termination trial, AH had moved in with her boyfriend, Kevin, and his family. Kevin initially failed a Department background check, but was granted an exception that would have allowed him to be around the children.

18

No. 56402-5-II
Consolidated No. 56409-2-II

hearing as to the dependency of AK. DH's guardian ad litem (GAL) reported in August 2021 that she recommended termination and that she "d[id] not foresee the possibility of a significant enough change in mom due to her developmental disability and instability to parent her children safely." *Id.* at 234.

A termination trial was set for August 16-20, 2021, as to both children. The trial was held as scheduled, with testimony from Tessica Welch, Brenda Sullens, Corissa Beairsto, Hildegard Flores, Deborah Ingram, Sarah England, David Russell, Dr. Steve Tutty, Rebecca Smallbeck, Kelli Boggs, Jerry Mullin, Terri Williams, Ana Masquera, Deborah Darnell, Colleen Rice-Lozensky, Kevin Bergman, Kris Camenzind, Nancy Jorgensen, and AH.

Dr. Tutty testified that he was familiar with current professional guidelines for working with individuals with intellectual disabilities, but did not testify as to what those guidelines were. He also testified that his 2017 report contained recommendations on how to tailor services to AH's intellectual needs. In Tutty's view, "when you have folks that have this level of impairment, you know it becomes very frustrating, because you may come up with certain interventions, like parenting classes or different interventions to improve that deficit, but it's very difficult for them to retain and retrieve that information." 1 VRP (Aug. 18, 2021) at 232. Tutty further testified that "it would take guidance and considerable practice and, you know, a lot of structure and cues [for AH] to understand how to solve" new problems as her children developed. 1 VRP (Aug. 18, 2021) at 234.

Tutty concluded that AH was not amenable to treatment because her "clinical and parental deficits since 2017 have not improved over time. . . . So because of that, she -- she's not a good candidate for treatment services." *Id.* at 247. Tutty went on to state that "this is the type of parent

19

No. 56402-5-II
Consolidated No. 56409-2-II

where you might, you know, have them complete this service or that service or another service. They're not really benefit[t]ing from that service, because it's very difficult for their brain to retain and retrieve that information." *Id.* He also endorsed the view that it would "be difficult for [AH] to benefit from any of these services" "even if the services were tailored to her deficits and they followed your recommendation." *Id.* Tutty drew a distinction between accommodating AH's intellectual disability and accommodating her executive functioning deficits: he believed that "we would certainly try to accommodate" intellectual disability but that AH's executive functioning deficit "really keeps here [sic] from meaningfully benefit[t]ing from any service that's been provided to her." *Id.* at 248.

AH's testimony revealed that she did not understand the rationale for the removal of her children. She attributed their removal to "[f]amily history" and could not remember if her social workers ever spoke with her about why DH and AK were removed. *Id.* at 123. Her testimony also revealed that she struggled to retain information from her parenting courses. For example, AH testified to having binders and paperwork given to her through parenting education, but could not recall what she learned in the parenting courses. She also could not recall her parenting instructors speaking to her about developmental stages in children.

At the close of the trial, the court issued an oral ruling terminating AH's parental rights as to both children. Its written ruling terminating AH's parental rights was issued on October 14, 2021. It found that AH was expressly and understandably offered or provided the following services:

20

No. 56402-5-II
Consolidated No. 56409-2-II

(1) Neurological evaluation and comprehensive parenting evaluation;
(2) Psychological evaluation and comprehensive parenting evaluation;
(3) Mental health assessments;
(4) Mental health treatment and individual counseling;
(5) Parenting classes and instruction as follows:
    1. Promoting First Relationships;
    2. Project Safe Care;
    3. Family Preservation Services (3 different sessions);
    4. TIPS/Leveling Up Parenting;
(6) Domestic violence victim support services;
(7) Impact of domestic violence on children seminar;
(8) Developmentally [sic] disability services and case management services through Developmentally [sic] Disabilities Administration (DDA);
(9) Housing resources;
(10) Gas vouchers and bus passes; and
(11) Caseworker services.

CP at 264. It found that these services were tailored to AH's disability, but it made no finding as to how that tailoring was accomplished. It also made no finding as to what professional guidelines were relevant to AH's disability or how those guidelines informed the Department's offer of services. *Id.* at 265. It concluded that AH was "not amendable to treatment by virtue of the clinical and parenting deficits identified that have not improved over time" and that "[AH]'s cognitive and executive functioning impairments make it difficult for [AH] to meaningfully benefit from any services." *Id.*

ANALYSIS

I. TERMINATION OF PARENTAL RIGHTS

"Parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Welfare of D.E.*, 196 Wn.2d 92, 102, 469 P.3d 1163 (2020). Children also have a strong interest in the preservation of their natural relationship with their parents. *Id.* at 103.

21

No. 56402-5-II
Consolidated No. 56409-2-II

Accordingly, "[t]he legislature has prescribed a statutory scheme that balances the parents' liberty interest with the child's right to a safe and healthy environment." *In re Dependency of K.D.S.*, 176 Wn.2d 644, 652, 294 P.3d 695 (2013). This scheme requires that "the State must prove six statutory elements by clear, cogent, and convincing evidence before terminating parental rights." *Id.*; RCW 13.34.190(1)(a)(i). Only after those elements are satisfied does the court examine whether termination is in the best interest of the children. *D.E.*, 196 Wn.2d at 108.

Of the six statutory elements codified at RCW 13.34.180(1)(a)-(f), AH challenges the trial court's decision as to subsection (d), which requires the Department to prove it understandably offered and provided her with necessary services, and (e), which requires the Department to prove there was little likelihood that AH's parenting deficiencies would be remedied. For the reasons discussed below, the trial court erred in concluding that the Department met its burden under RCW 13.34.180(1)(d) to understandably offer and provide services to AH. We therefore reverse.

A. RCW 13.34.180(1)(d): DEPARTMENT'S OFFER OF SERVICES

*1. Legal Principles*

Prior to terminating parental rights, the Department must have "expressly and understandably offered or provided" to the parent all court ordered services as well as "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). The Department's burden of proof is "clear, cogent, and convincing evidence." RCW 13.34.190(1)(a)(i). "This is the equivalent of saying that the ultimate fact in issue must be shown by evidence to be highly probable." *In re Parental Rights to M.A.S.C.*, 197 Wn.2d 685, 698, 486 P.3d 886 (2021) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

No. 56402-5-II
Consolidated No. 56409-2-II

To meet its burden, the Department must first investigate and identify the parent's needs. *In re Parental Rights to D.H.*, 195 Wn.2d 710, 727, 464 P.3d 215 (2020). If the Department has reason to believe the parent has an intellectual disability, then "it must make reasonable efforts to ascertain the extent of the disability and how it could interfere with the parent's ability to understand and benefit from DCYF's offer of services." *M.A.S.C.*, 197 Wn.2d at 699.

Next, the Department "must tailor its offer of services to ensure that the offer is reasonably understandable to the parent." *Id.* The tailoring must (1) "be informed by current professional guidelines" and must (2) "accommodate the individual parent's needs rather than relying on broad-based or untested assumptions about the needs and abilities of people with intellectual disabilities." *Id.* To show that its offers were informed by professional guidelines, it is "essential" that the Department present "evidence of what the applicable current professional guidelines would be." *Id.* at 702.

Trial courts must apply an objective standard to decide if the Department has met its burden. *Id.* at 699-700. This requires viewing the evidence as would "an objective observer who is aware of the nature and extent of the parent's intellectual disability, as well as current professional guidelines for communicating with people who have similar disabilities." *Id.* at 700. We review the trial court's decision terminating parental rights for substantial evidence. *D.H.*, 195 Wn.2d at 718 (2020).

*2. Application*

Here, AH argues that the Department failed to show it tailored its offer of services to AH's intellectual disability because (1) the Department failed to present evidence of the relevant guidelines for communicating with parents with intellectual disabilities, and that (2) it failed to

23

No. 56402-5-II
Consolidated No. 56409-2-II

show it assigned social workers or utilized service providers with the requisite knowledge of relevant professional guidelines. The Department counters that its social workers and service providers were guided by Dr. Tutty's report, and that Dr. Tutty was familiar with the relevant professional guidelines. Because the court was required to view the evidence as would an objective observer who is aware of the relevant professional guidelines, and because no evidence of the relevant guidelines was before the court, we reverse.

*(a) Whether Communication Was Tailored According to Professional Guidelines*

The trial court here never heard evidence as to what the applicable professional guidelines were for communicating with AH. True, Dr. Tutty testified that he was familiar with professional guidelines for working with people with intellectual disabilities, but Tutty did not describe those guidelines or identify which parts of his report reflected those guidelines. Without any evidence of the relevant guidelines, it is impossible for a court to view the evidence as "an objective observer who is aware of . . . current professional guidelines for communicating with people who have similar disabilities." *Id.* at 700. Indeed, without such evidence, "judges and attorneys . . . cannot reliably determine what is appropriate and understandable in that context." *Id.* at 702. Therefore, the Department's failure to present evidence about the relevant guidelines is dispositive.

Even if we were to give Dr. Tutty's recommendations the weight of professional guidelines, as the Department appears to suggest, the recommendations do not describe how best to communicate with AH. Instead, social workers were left to decide on their own how best to convey important information to AH. And the record does not reflect that AH's social workers had any training that would have familiarized them with the current professional guidelines for communicating with an intellectually disabled parent. The only social worker who testified to any

24

No. 56402-5-II
Consolidated No. 56409-2-II

formal training was Rice-Lozensky, who had taken "a class or two" on special education as part of the undergraduate degree she received in 1980. 2 VRP at 459. It was an unjustified leap for the trial court to conclude that communications were properly tailored simply because the social workers reviewed Tutty's report.

Unsurprisingly, given their lack of training and lack of guidance, AH's social workers appeared unwilling or unable to adjust their communications with AH to help her better understand her situation. For example, when Welch was asked how she changed the way she worked with AH due to AH's disability, she responded, "when we met there was usually another person present, usually her grandmother, so when she left the meeting, she could come to me for information, but she also had her grandmother who had the information. And I also provided the information orally and in writing." 1 VRP (Aug. 16, 2021) at 37. AH's second social worker, Beairsto, went through AH's parental deficiencies with her "line-by-line," but did not state that this was unique to AH's disability or discuss specific ways[6] she tailored her communications with AH. *Id.* at 117. Rice-Lozensky, the only social worker with disability-related training, did not describe ways she tailored her communications with AH to be better understood. Indeed, Rice-Lozensky's assistance with housing came in the form of a one-half-inch thick "generic" packet "of general resources in the Lewis County area, including housing," as was her practice "generally." *Id.* at 547, 531-32.

---

[6] Beairsto did, however, describe a time when AH was unable to focus on a conversation about FPS during a home visit, so Beairsto decided to arrange a meeting at the CPS office with AH's grandmother present to go over the same information. This shows that Beairsto was able, at least in one instance, to respond to AH's needs. However, it is insufficient to overcome the general lack of testimony about communicating the basics of AH's case in a tailored manner.

No. 56402-5-II
Consolidated No. 56409-2-II

Without tailored communications from her social workers, it appears that AH did not understand why her children were removed or what was expected of her during the dependency. As early as 2017, AH's social worker noticed that AH misunderstood[7] why DH was removed from her care. The social worker did not testify that she corrected the misunderstanding,[8] and AH maintained the same[9] misunderstanding when she testified at the termination trial in 2021. Despite being ordered to receive domestic violence services, AH testified that she did not know what domestic violence was. Similarly, AH did not understand what was included in the caregiver services she was offered by the DDA. When asked what a caregiver does, AH responded, "Like a person that will wipe your butt or take care of you or bathe you. I don't need that. I know how to do that myself." *Id.* at 212. Without understanding what was being offered, AH declined caregiver services, and this weighed against her in the court's ultimate decision.

The closest thing in Tutty's report to a recommendation for communicating with AH was the recommendation that AH or her service providers "record specific care instructions and

---

[7]     "Q. Did you also talk to her about why [DH] was removed from her care?
        A. Yes. I asked her what her understanding of why he was removed. She had
        reported it was *because of her family*. Yeah.
        Q. And was [DH] removed because of [AH]'s family?
        A. No. He was removed because of the concerns for her lack of parenting skills."

1 VRP (Aug. 16, 2021) at 35 (emphasis added).

[8] Instead, the social worker decided to "talk to [AH] about our concerns for her living with *unsafe family members*." 1 VRP (Aug. 16, 2021) at 35 (emphasis added).

[9]     "Q. And why were they [DH and AK] removed?
        A. *Family history*."

1 VRP (Aug. 16, 2021) at 123 (emphasis added).

26

No. 56402-5-II
Consolidated No. 56409-2-II

routines for her child on paper and post it visually in the home" to help "cue her memory" as to various parenting skills and routines. Exs. (Vol. I) at 386. No social worker or service provider testified to producing such visual aids, or to encouraging AH to do so herself. Instead, they assumed that concrete examples and in-depth explanations would be the best way to teach parenting skills to AH. Even the FPS provider who had training that independently supported the use of visual aids did not recall providing them to AH.

Troublingly, it appears that AH was judged negatively for the hallmark features of her disability that should have been accounted for by tailoring communications to suit her needs. AH's parenting instructor found it "problematic" that AH would "would rely on promptings" when adjusting to her child's changing developmental stages. 1 VRP (Aug. 16, 2021) at 75. But as Dr. Tutty later testified, "it would take guidance and considerable practice and, you know, a lot of structure and cues [for AH] to understand how to solve" new problems as her children developed. *Id.* at 234. The court nonetheless emphasized in its final order that a visitation supervisor "had to repeat the same parenting suggestions to [AH] week after week" and that a parenting instructor had to give AH "repeated instructions" on nutrition until AH eventually "improved in providing nutritional snacks." CP at 266-67. The fact that AH's nutritional awareness improved upon repeated cues and reminders shows precisely why the law requires tailoring communications to a parent's disability. It is unfortunate that AH did not receive this type of tailoring consistently in other domains.

Given that it heard no evidence about professional guidelines and no evidence showing that communications were tailored to improve AH's understanding, the court lacked sufficient

27

No. 56402-5-II
Consolidated No. 56409-2-II

evidence to conclude that services were "expressly and understandably offered or provided" to AH as required by RCW 13.34.180(1)(d).

It is worth noting that the tailoring of communications is a separate question from the tailoring of services. *Compare D.H.*, 195 Wn.2d at 727 ("Within the prerequisite of RCW 13.34.180(1)(d), the services must be tailored to the needs of the individual.") *to M.A.S.C.*, 197 Wn.2d at 699 ("DCYF does not deny that it must tailor *its offer of services*, as well as the services themselves, to ensure that the offer is 'expressly and understandably' made to the parent in light of their individual needs. RCW 13.34.180(1)(d).") (emphasis added). The trial court's decision appears to conflate the two questions—it found that the services were "expressly and understandably offered," but it did not discuss how that offer was tailored to accommodate AH's disability. CP at 264. Instead, it focused on how the services themselves were tailored according to Dr. Tutty's report. Here, the *offer* of services was not sufficiently tailored, but we need not reach the question of whether the services themselves were sufficiently tailored.

*(b) Whether Services Would Have Been Futile*

The Department argues that even if it did not sufficiently tailor its offer, we should affirm the termination on the ground that services would have been futile. AH maintains that the court did not make a futility finding, so we cannot rely on the futility doctrine to affirm. In the Department's view, the court's oral statement that it would be a "useless act" for the Department to continue offering services to AH constitutes a reviewable finding of futility. Br. of Resp't at 44, quoting 2 VRP at 651. We disagree and decline to rule on the issue of futility.

If the record shows that additional services would be futile, trial courts may find that all necessary services were offered and may terminate parental rights. *In re Parental Rights to*

28

No. 56402-5-II
Consolidated No. 56409-2-II

*K.M.M.*, 186 Wn.2d 466, 483, 379 P.3d 75 (2016), *In re Parental Rights to B.P.,* 186 Wn.2d 292, 316, 376 P.3d 350, 362 (2016). "The provision of services is futile where a parent is unwilling or unable to participate in a reasonably available service *that has been offered or provided.*" *K.M.M.*, 186 Wn.2d at 483 (emphasis added). Like the other ways to support a finding under 13.34.180(1)(d), a finding that services would be futile must be supported by clear and convincing evidence. *B.P.*, 186 Wn.2d at 321.

Here, it is doubtful that the court made a reviewable finding of futility when it said that continuing to offer services would be "useless." 2 VRP at 651. The court's full statement was,

> Even if there was some evidence that there was something that could be done to remedy these deficiencies, she has steadfastly refused to participate in any of these -- in most of these services. She does not need help, she says. She does not want to use the DDA services. A number of things she simply would not participate in.
>
> So we get to the point of the [sic] continuing to offer services, it becomes a bit of a useless act. And I think that's the situation that we've arrived at in this case.

2 VRP at 651. The court's statement that continuing to offer services would be useless, in context, appears to depend on the fact that services have already been offered and refused. But as we conclude above, the Department's initial offer was not reasonably understandable to AH because it was insufficiently tailored. A finding that *continuing to offer* services would be futile is different than a finding that properly tailored services would have been futile in remedying AH's parental deficiencies. Therefore, the court made no finding of futility for us to review.

Even so, it is worth noting that there is insufficient evidence in the record to sustain such a finding. Because the court was presented with no evidence of professional guidelines for working with individuals with intellectual disabilities, it could not have determined that conforming with those guidelines would have been futile. Dr. Tutty was the only witness who testified that he was

29

No. 56402-5-II
Consolidated No. 56409-2-II

familiar with professional guidelines. Tutty concluded that AH was not amenable to treatment because her "clinical and parental deficits since 2017 have not improved over time. . . . So because of that, she -- she's not a good candidate for treatment services." 1 VRP (Aug. 18, 2021) at 247. Tutty also endorsed the view that it would "be difficult for [AH] to benefit from any of these services" "even if the services were tailored to her deficits and they followed your recommendations." *Id.* at 247. However, these statements, taken in the context of the whole record, do not constitute sufficient evidence to support a finding that tailored services would have been futile. When Tutty observed AH's parenting in 2021, he found that AH "was aware of the safety and surroundings" and that she "maintained close proximity to [AK]" and "engaged [DH] with toys and snacks." Exs. (Vol. I) at 416. He also observed AH to be "playful and active with her children" and "reinforced her children's cooperative play." Exs. (Vol. I) at 416. These observations, along with the improvement reported by some of AH's service providers, show that there is an open question as to how much more AH could have progressed if she had been understandably offered services in the first instance. A finding of futility is not supported by clear and convincing evidence in the record.

## CONCLUSION

In conclusion, the Department failed to present sufficient evidence supporting the termination of AH's parental rights because it did not present evidence of the applicable professional guidelines for communicating with individuals with AH's disability. Without such evidence, the court could not assess whether the Department's offer of services was properly tailored to AH's disability or whether properly tailored services would have been futile. We recognize that AH's children have been living with their foster family since birth, and that stability

30

No. 56402-5-II
Consolidated No. 56409-2-II

is an important goal of the law surrounding dependencies. However, there is evidence of an ongoing attachment between AH and her children here, despite their protracted separation. We therefore reverse the trial court's termination of AH's parental rights as to DH and AK.

_____
Cruser, J.

We concur:

_____
Maxa, J.

_____
Glasgow, C.J.

31