IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | No. 33890-8-III |
| | ) | (consolidated with |
| I.M.-M. | ) | No. 33891-6-III) |
| | ) | |
| ——————————————————— | ) | |
| | ) | |
| In the Matter of the Parental Rights to | ) | PUBLISHED OPINION |
| | ) | |
| Z.M.-M. | ) | |

PENNELL, J. — The Department of Social and Health Services (Department) is obliged to provide necessary and available reunification services prior to terminating parental rights. When a parent is cognitively impaired, services must be tailored to a parent's individual needs. This burden on the Department is significant, but so are the rights at stake. Only on a showing of futility will a termination order be upheld when the Department fails to meet its obligations.

C.M.'s parental rights were terminated after a two-year dependency. Within at least 60 days of initiating the dependency, the Department became aware C.M. had cognitive impairments that would likely impact her ability to address parental deficiencies. Yet, C.M.'s service providers were never notified of her impairments and tailored services were never offered. During C.M.'s termination trial, the Department

failed to present competent evidence that tailored services would have been futile. Based on these circumstances, the termination order is reversed.

## FACTS

C.M. became involved in dependency proceedings after she pushed her child, who was in a stroller, across a busy street while attempting to flee apprehension for shoplifting. This was not C.M.'s first involvement with the Department. She had previous referrals due to substance abuse and homelessness. The dependency petition identified drug use and transience as continuing concerns, particularly because C.M. was pregnant and the drug use might impact her unborn child.

The dependency petition recognized C.M. has low cognitive functioning. A year prior to the petition, a Department worker had issued a report stating C.M.'s IQ is 79 and she is "DD." 2 Verbatim Report of Proceedings (VRP) (Sept. 10, 2015) at 213. Nothing in the record clarified the basis for this statement or whether "DD" meant developmentally disabled or developmentally delayed. *See id.* Based on the information in the dependency petition, the court ordered C.M. to undergo a psychological evaluation.

C.M. promptly completed the required psychological evaluation with Dr. Sean Smitham. From the evaluation Dr. Smitham made several findings. Important here, he determined C.M. was significantly cognitively impaired. Her IQ was lower than 91

percent of individuals her age, raising "concerns about her . . . ability to hold a job, pay bills, [and] take care of herself." 1 VRP (Sept. 9, 2015) at 105.

Dr. Smitham found the severity of C.M.'s impairment surprising because it had not been readily apparent prior to testing. According to Dr. Smitham, C.M. demonstrated strong street smarts and had "become very good at reading social cues and presenting herself socially in a way that probably masks her intellectual deficits." *Id.* at 106. Based on C.M.'s adaptive skills, Dr. Smitham believed it would be difficult, though perhaps not impossible, for untrained service providers to understand the scope of C.M.'s intellectual impairment and needs. *Id.* at 114-15.

Dr. Smitham connected C.M.'s intellectual impairment to difficulties she would likely face in completing reunification services. According to Dr. Smitham, C.M. lacked self-awareness about her intellectual deficiencies, making her resistant to change. He also believed she would be slow to grasp information and would require repetition in order to learn new skills. *Id.* at 109, 114. Significantly, Dr. Smitham believed C.M. would have difficulty in a typical chemical dependency group setting because the interactions are all verbal. *Id.* at 125-26.

While Dr. Smitham made several important findings about C.M.'s level of intellectual functioning, his assessment was incomplete. Although Dr. Smitham found

3

evidence C.M. might be developmentally disabled, he never reached a final diagnosis. This was because he never performed the applicable testing. *Id.* at 112.

Dr. Smitham prepared a report documenting his findings and shared it with the Department. However, the contents were never relayed to C.M. or to the majority of C.M.'s service providers. The lone service provider to receive Dr. Smitham's report was C.M.'s mental health therapist, Christie Pelz. Ms. Pelz did not receive the report until approximately 19 months after the dependency petition had been filed and nine months after the Department filed to move from reunification to termination. She was not trained to work with cognitively impaired individuals. At trial, Ms. Pelz admitted she did not know whether C.M.'s problems with progressing in therapy were related to her intellectual deficits. 2 VRP (Sept. 10, 2015) at 271.

Although C.M.'s primary parental deficiency related to substance abuse, Dr. Smitham's report was never shared with C.M.'s chemical dependency counselors. Not surprisingly, C.M. struggled to make progress. According to Kolleen Seward, C.M.'s counselor, C.M. "would do really well processing in a one-on-one" setting and in clinic groups, but she "appeared to have difficulty when she got out of that structure and out into—transferring that knowledge to the real world." 1 VRP (Sept. 9, 2015) at 50. Ms. Seward testified she did not know of any cognitive difficulties that needed to be

4

addressed with C.M. *Id.* at 47-48, 56. However she did observe C.M. had problems with homework and with interpreting what she was asked to do. *Id.* at 51. In response to this difficulty, Ms. Seward took time to review C.M.'s homework one-on-one. *Id.*

During the period C.M. spent in treatment, she submitted numerous positive urinalysis tests and failed to show for others. C.M. was ultimately discharged from Ms. Seward's treatment program prior to graduation. Although C.M. was subsequently referred to another provider, she failed to follow through.

Apart from treatment, C.M. did not make notable progress developing her parenting skills. C.M.'s family therapy provider was an individual named Dave Smith. Mr. Smith found C.M. difficult to work with because she had an over-inflated perception of her parenting abilities. C.M. would insist she already knew how to do things, but then would later forget and not follow though until coached. Mr. Smith expressed frustration with C.M.'s inability to retain information and develop her skills. During his testimony, Mr. Smith stated he had concerns about C.M.'s intellectual abilities and attempted to provide some accommodations. But he could not recall seeing C.M.'s mental health evaluation. There is no indication Mr. Smith was trained to work with cognitively impaired persons.

5

After considering testimony presented at a two-day trial, the trial court terminated C.M.'s parental rights. The court rejected the argument that C.M. should have been provided developmental disability services, finding the evidence was insufficient to conclude C.M. was disabled. The court also found many of C.M.'s service providers were aware of her intellectual difficulties and provided appropriate accommodations. In addition the court found that even if C.M. should have been provided services tailored to her disability, this omission would not bar termination because enhanced services would not have remedied C.M.'s parental deficiencies in the foreseeable future.

C.M. timely appealed the order of termination to this court.

## ANALYSIS

Our decision is guided by well-established legal principles. Parents enjoy fundamental liberty interests in the continued care, custody, and companionship of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Deprivation of parental rights is only permissible if supported by powerful reasons. *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995). A trial court's termination decision involves a two-step process. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). "The first step focuses on the adequacy of the parents" and requires the Department to prove, by clear, cogent, and convincing evidence,

6

the six termination factors set forth in RCW 13.34.180(1). *Id.* If this burden is satisfied,

termination may be ordered if the Department establishes, by a preponderance of the

evidence, that termination is in the best interests of the child. *In re Dependency of K.N.J.*,

171 Wn.2d 568, 576-77, 257 P.3d 522 (2011). Only if the first step is satisfied may the

court reach the second step. *A.B.*, 168 Wn.2d at 911.

C.M.'s appeal turns on the first step of the analysis. Specifically, whether the trial

court appropriately found the Department offered C.M. necessary and available services,

as required by RCW 13.34.180(1)(d). We review the trial court's decision for substantial

evidence in light of the demanding standard of review. *In re Parental Rights to B.P.*, 186

Wn.2d 292, 313, 376 P.3d 350 (2016).

By statute, the Department was required to offer C.M. "all necessary services,

reasonably available, capable of correcting the parental deficiencies within the

foreseeable future." RCW 13.34.180(1)(d). A service is "necessary" if it is needed to

address a condition that precludes reunification of the parent and child. *In re Welfare of

C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010). The inquiry is not limited to services

ordered by the court during the dependency, but rather the Department must show it

offered all necessary available services. *See In re Dependency of T.L.G.*, 126 Wn. App.

181, 200, 108 P.3d 156 (2005). Further, the Department must tailor the services offered

to the individual's needs. *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). In the context of a parent with both mental health and chemical dependency needs, the Department is obliged to provide integrated services. *In re Welfare of S.J.*, 162 Wn. App. 873, 882, 256 P.3d 470 (2011).

The trial court's finding that C.M. was offered all necessary services is not supported by substantial evidence. C.M. was never offered integrated mental health and chemical dependency services as required by our case law. *Id.* From Dr. Smitham's evaluation, the Department was aware C.M. had a significant cognitive impairment impacting her ability to succeed in chemical dependency treatment and other services. This observation alone triggered the Department's obligation to provide integrated services. *Id.* Yet no such services were offered. Regardless of whether C.M. was actually developmentally disabled, the Department failed to provide available and appropriate services.

The trial court's finding that C.M. was provided sufficient accommodations, despite the lack of integrated services, is not supported by the record. None of C.M.'s service providers testified they were trained to work with cognitively disabled persons. Although Ms. Seward and Mr. Smith tried to provide C.M. additional attention upon

discovering she had some learning troubles, neither provider deployed techniques specific to C.M.'s impairment.

Most significantly, C.M. was never provided sufficient accommodations during chemical dependency services. Ms. Seward testified she was unaware C.M. had cognitive difficulties or a learning impairment. 1 VRP (Sept. 9, 2015) at 47-48, 56. The assistance Ms. Seward provided C.M. was limited to completing homework assignments. Because she lacked appropriate information about C.M.'s needs, Ms. Seward was never equipped to help C.M. retain what she had learned in treatment and apply her skills to the outside world. The need for appropriate chemical dependency services was critical. C.M.'s primary parental deficiencies were substance abuse and homelessness. Without ensuring C.M.'s chemical dependency providers were aware of C.M.'s impairments and prepared to address them, the Department never provided C.M. the tools necessary to satisfy the requirements of the dependency.

The trial court identified Dave Smith's work with C.M. as evidence the Department accommodated C.M.'s impairment. During his time with C.M., Mr. Smith discerned C.M. had some learning problems and he attempted to provide her with extra support. However, this added assistance was insufficient to satisfy the Department's burden. Not only did Mr. Smith lack sufficient information to provide appropriate

services, Mr. Smith's services were not in the right context. Mr. Smith worked with C.M. on family therapy to enhance her parenting skills. He was not an individual counselor or a substance abuse provider. Although it was appropriate for the Department to provide C.M. parenting services, deficient parenting skills was never one of C.M.'s primary problems.[1] The reason C.M.'s children were removed from her care was because she struggled with drug use and homelessness. *Id.* at 141. These were not problems Mr. Smith was in a position to address.

Not only did the Department fail to provide C.M. with services tailored to her needs, it did not investigate those needs, as contemplated by the dependency court's own orders. C.M.'s dependency orders required a mental health evaluation. The only possible basis for this requirement was the reference in the dependency petition to C.M.'s cognitive impairment. No other mental health concerns were documented. Given this factual underpinning, one would expect C.M.'s mental health evaluation to focus on her cognitive abilities and provide a complete assessment. Yet this did not happen. Even though the Department's records previously indicated C.M. was "DD," the evaluation

---

[1] During her parenting assessment, C.M. was observed to have "nice basic parenting skills." 1 VRP (Sept. 9, 2015) at 64. The main concern identified during C.M.'s assessment was substance abuse and how that might impair C.M.'s ability to meet her children's needs. *Id.* at 63-64.

10

procured for C.M. never resolved this issue.[2]  2 VRP (Sept. 10, 2015) at 213.

The Department's failure to investigate the apparent likelihood of a developmental disability diagnosis was significant.  Had the Department obtained a comprehensive mental health evaluation revealing a developmental disability diagnosis, it would have been statutorily obliged to refer C.M. for services with the Department's developmental disabilities administration and coordinate a care plan.  RCW 13.34.136(2)(b)(i)(B).  Such coordination would likely have ensured the provision of tailored services.  The Department cannot escape its obligation to provide coordinated services by inexplicably failing to investigate the likelihood a parent is developmentally disabled.  Our case law specifically requires the Department to identify a parent's specific needs and provide services to meet those needs.  *S.J.*, 162 Wn. App. at 883.  This obligation was not met.

Our conclusion that the Department failed to provide C.M. necessary and available services does not end our appellate inquiry.  The Department is excused from providing otherwise required services if doing so would be futile.  *In re Welfare of M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (2008).  The trial court found the futility requirement was

---

[2] The Department's brief inaccurately refers to C.M. as "not developmentally disabled."  Br. of Resp't at 22.  Because C.M. has never been tested for a developmental disability, the most that can be said is she has not been diagnosed as developmentally disabled.

satisfied. Substantial evidence does not support this conclusion.

No one working with C.M. during the dependency was aware of the full extent of C.M.'s cognitive impairment. As a result, none of the trial witnesses were able to offer competent testimony about whether integrated mental health and chemical dependency services would have been beneficial. The closest testimony came from Dr. Smitham, who expressed doubt about whether C.M. would ever be able to successfully parent her children, given her lack of a family support system. But because Dr. Smitham was not fully aware of C.M.'s needs, he lacked a sufficient basis for concluding additional services would be futile.

This is not a case where the parent's actions alone demonstrate the futility of additional services. C.M. made notable efforts to engage in services and work with her providers. She promptly obtained a mental health evaluation, a chemical dependency evaluation, and a parenting assessment, as requested by the Department. Despite being homeless, C.M. kept in basic touch with her social workers.[3] She engaged in various types of recommended services, including mental health therapy that was "pretty consistent" over the course of two years. 1 VRP (Sept. 9, 2015) at 175. C.M. also

---

[3] C.M.'s second social worker testified that C.M. sometimes fell out of contact. However, no specifics were provided.

regularly participated in visitations with her children up until the very end of the dependency. 2 VRP (Sept. 10, 2015) at 329.

This is also not a case where the Department can show futility based on irreconcilable parent-child detachment. *See In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 379 P.3d 75 (2016). During family therapy sessions with Mr. Smith, C.M.'s children expressed delight at seeing her.[4] These positive interactions continued until late in the dependency.[5]

C.M. demonstrated a willingness to engage in services for substantial periods of time. She worked "hard at being a parent." 1 VRP (Sept. 9, 2015) at 194. While C.M. was far from perfect, she was also not provided services tailored to her needs. Under the facts of this case, the record does not permit the conclusion that C.M. would have failed to progress, even if the Department had complied with its obligations. The trial court's findings to the contrary are not supported by substantial evidence.

---

[4] According to the family therapist, Mr. Smith, C.M.'s children were "tickled to see her. They were excited to see her. They would run to her." 1 VRP (Sept. 9, 2015) at 89.

[5] During a visit late in the dependency, defense nurse expert Deliah Bruskas observed that C.M.'s children were "excited to see her. They ran towards her. They predominantly—whoever brought them, they just kind of left their presence and just kind of like magnets went to [C.M.]." 2 VRP (Sept. 10, 2015) at 232.

## CONCLUSION

Based on the foregoing, the matter is reversed and remanded for further action consistent with this opinion.

_____
Pennell, J.

I CONCUR:

_____
Fearing, C.J.

14

33890-8-III (Consolidated with 33891-6-III)

KORSMO, J. (dissenting) — This court has no ability to find facts. Since the trial court found the alleged facts upon which the defense rested to be unproven, we have no ability to find otherwise. Accordingly, I dissent.

The critical portion of this case is found in the trial court's oral remarks, summing up its judgment:

> Compellingly, Mr. [sic] Smitham testified that he did not feel comfortable diagnosing Ms. [C.M.] with a developmental disability. As such, the record does not contain sufficient evidence to support such a conclusion.

2 Verbatim Report of Proceedings (Sept. 10, 2015) at 332. The trial court also noted in its written findings that the treatment providers all worked with her in a manner to address her "shortcomings" but with "little or no progress." Clerk's Papers (CP) at 95. The court concluded that, "if the mother is developmentally delayed, there are no services that could have helped her." CP at 95.

We have noted many times that we lack the ability to find facts and are not in a position to accept as truth evidence which the trial court rejected. *E.g., Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009). As stated there:

No. 33890-8-III
*In re Parental Rights to I.M.-M. and Z.M.-M.*

> In contrast, where a trial court finds that evidence is insufficient to persuade
> it that something occurred, an appellate court is simply not permitted to
> reweigh the evidence and come to a contrary finding. It invades the
> province of the trial court for an appellate court to find compelling that
> which the trial court found unpersuasive.

*Id.*

Yet, that is exactly what the majority opinion does here. Based on its own determination that C.M. was developmentally disabled, or should have been found to have been developmentally disabled, the majority then discounts the substantial evidence supporting the court's actual findings. However, that is not the standard by which we consider whether the trial court's findings are correct. We look to see whether there was sufficient evidence "to persuade a rational, fair-minded person that the finding is true." *Cantu v. Dep't of Labor & Indus.*, 168 Wn. App. 14, 21, 277 P.3d 685 (2012). We do not weigh that evidence against competing evidence, let alone against competing evidence that does not exist.

Another factor that raises concerns here is the context in which the developmental disability evidence, such as it is, was used. If counsel thought there actually was evidence that his client was developmentally disabled, he failed to act on it. There was no motion for summary judgment, no motion for a directed verdict, no motion to re-open the dependency, nor any motion to compel further evaluation or services. From this I infer that veteran defense counsel did not believe there was any evidence to support a finding that his client was developmentally disabled and in need of extra services. If

2

there was such a glaring hole in the State's case; counsel would have exploited it. Instead, he merely raised the possibility that a disability existed as a shield against the State's argument that it had provided all necessary services.

While I agree that the Department of Social and Health Services cannot bury its head in the sand and decline to investigate a parent's suspected issues, there is no evidence that happened here. Although C.M. presented well, each of the treatment providers determined that she needed more assistance than normal and tailored their approaches to her. Despite those efforts, she failed to make any progress at all anywhere, even while dutifully showing up for most appointments. The trial court understandably determined that more efforts would be futile. While the majority can speculate that maybe she had more extensive difficulties than the experts and treatment providers noted, and that maybe there is a different way of getting through to her, there simply is no evidence such is the case. Speculation simply cannot replace evidence.

The trial court carefully considered the argument C.M. made and determined that it was without evidentiary foundation. Substantial evidence supports that determination. This court should not be crediting her argument under those circumstances.

I respectfully dissent.

Korsmo, J.

3