# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

In the Matter of the Dependency of

Aa.D.Y. and Al.D.Y.

No. 83410-0-I
(consolidated with
No. 83411-8-I)

ORDER DENYING MOTION
FOR RECONSIDERATION
AND WITHDRAWING AND
SUBSTITUTING OPINION

The appellant, I.A., has filed a motion for reconsideration of the opinion filed on April 10, 2023. The court has considered the motion, and a majority of the panel has determined that the motion should be denied but the opinion should be withdrawn and a substitute opinion filed; now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied; it is further

ORDERED that the opinion filed on April 10, 2023 is withdrawn; it is further

ORDERED that a substitute unpublished opinion shall be filed.

_Birk, J._

_Smith, C.J._                    _Andrus, J.P.T._

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br><br>Aa.D.Y. and Al.D.Y. | No. 83410-0-I<br>(consolidated with<br>No. 83411-8-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — I.A. appeals a superior court order terminating I.A.'s parental rights to minor children Aa.D.Y. and Al.D.Y. I.A. asserts primarily that the Department of Children, Youth, and Families (Department), having reason to believe that I.A. may have had an intellectual disability, did not make reasonable efforts to ascertain the extent of the disability, did not tailor its offer of services to ensure the offer would be reasonably understandable to I.A., and did not offer tailoring that was informed by current professional guidelines for communicating with parents with similar disabilities. We conclude that the facts as found by the superior court and supported by substantial evidence establish that the Department met these requirements and otherwise established the elements supporting termination. We affirm.

I

A

Aa.D.Y. and Al.D.Y. were born prematurely on September 18, 2017. Several weeks before being discharged, I.A. and the children's maternal

grandmother (grandmother) began attending training to learn how to care for their needs. Aa.D.Y. required an oxygen tank and a feeding tube. A safety plan called for I.A., Aa.D.Y., and Al.D.Y. to reside with the grandmother after discharge from the hospital. Rather than following that plan, I.A. left the hospital with the grandmother and the children, but in the parking lot she got into the father's car with the children and left.[1]

The Department received two contacts in February 2018 and March 2018 based on concern for I.A.'s ability to care for the children. On February 6, 2018, a hospital social worker expressed concern because the children were medically fragile, I.A. was not keeping her scheduled appointments and trainings, and I.A. was using cannabis. On March 29, 2018, the children's pediatrician's office reported to Child Protective Services that they had missed four appointments during that month. Later that day, I.A. took both Aa.D.Y. and Al.D.Y. to the pediatrician's office for a weight check appointment, and both appeared "to be doing quite well, gaining weight since last visit appropriately."

On April 9, 2018, police stopped a vehicle in which the children and both their parents were riding. The father was arrested for violating a domestic violence (DV) no contact order protecting I.A., and I.A. was arrested on outstanding warrants and for obstruction after giving police an identification card that was not her own. The Department obtained emergency orders authorizing it to take Aa.D.Y. and Al.D.Y into protective custody and the agency placed them with the

---

[1] The father's rights were relinquished in a separate order on September 22, 2020 and are not at issue in this appeal.

grandmother. A contested shelter care hearing led to an order noting the Department's recommendation that I.A. obtain a parenting assessment with a psychological component and follow the provider's recommendations, DV counseling, and providing for monitored visits with the children. I.A. later told her neuropsychologist that she understood the children were removed from her care due to concerns about cannabis use and depression.

B

On October 9, 2018, the court signed a dependency order as to I.A. According to Jessica Liebert, a social worker assigned by the Department in September 2019, there was information about I.A. available in the Department's computerized files that indicated I.A. may have some executive functioning issues. The grandmother testified that I.A. had had an individualized education plan (IEP) starting in junior high. In the dependency order, the court ordered services for I.A. consisting of a neuropsychological evaluation, parenting assessment, "Homebuilders" or another in-home service, and DV victim services, including DV focused counseling. The order further required that I.A. follow all agreed recommendations. The court reserved ordering services for I.A. as to "Random UAs [urinalysis] and Drug/Alcohol evaluation." In a December 21, 2018 order titled, order on department's motion for partial disposition regarding mother's services and parents' visitation, the court ordered I.A. to complete random UAs once per week for 30 days.[2]

_____

[2] A service letter to I.A. dated December 10, 2019, references the October 9, 2018 dependency court order and a disposition order dated December 10, 2018.

I.A. completed a parenting assessment with Tricia Cunningham, whose report is dated February 10, 2019. Cunningham testified that I.A.'s cognitive functioning appeared "within average range," which means "typically" the parent was "able to have a conversation back and forth" and "able to answer questions," without "operating at maybe a slower developmental level." Cunningham said she would have noted it in her report if she had observed cognitive functioning not within the average range. Cunningham recommended I.A. participate in parent coaching, a DV support group, mental health evaluation and treatment, and regular visits with Aa.D.Y. and Al.D.Y.

On August 8, 2019, I.A. completed a mental health and a drug and alcohol evaluation at Sound Mental Health. The evaluator recommended I.A. participate in American Society of Addiction Medicine (ASAM) Level 3.5 inpatient treatment and ASAM Level 2.1 intensive outpatient treatment. Both levels of treatment are described as being available at Sound Mental Health. Sound Mental Health's practice is to reach clients through phone calls "on a regular basis," as well as occasionally sending e-mails or letters, attempting to engage the client. The record contains 13 UA referral forms ranging from September 2019 through August 2021.

---

The record does not include an order dated December 10, 2018 and there is not testimony about an order of that date. It is possible that the reference to a December 10, 2018 order is a typographical error, since the listed services in the letter appear to match those listed in the October 9, 2018 dependency order and the December 20, 2018 order for UAs.

There is no evidence I.A. completed a UA.[3] It is unclear from the record if I.A. participated in substance use treatment, and if so, to what extent.[4]

At a review hearing on November 19, 2019, the superior court found I.A. to be in partial compliance with the order for services. However, the superior court concluded I.A. had not made progress toward correcting the deficiencies that necessitated the children's placement outside I.A.'s care. The superior court ordered that the Department should file a termination petition, which was later filed on January 10, 2020.

C

In 2018, the Department referred I.A. to Dr. James Connor for a neuropsychological evaluation, but, for reasons not apparent from the record, I.A. did not complete the evaluation. On December 10, 2019, Liebert sent a service letter to I.A. that explained the Department and I.A.'s attorney had agreed to refer I.A. to Dr. Marnee Milner for the neuropsychological evaluation, and an appointment had been set for January 6, 2020. Liebert testified she continued to

---

[3] The superior court found "the CASA testified that the one UA [I.A.] did complete was positive for amphetamines." I.A. does not challenge this finding; however, the superior court ordered stricken the testimony supporting it. In addition, the superior court relied, in part, on I.A.'s ability to go to the UA testing location to support its finding that she "had an understanding sufficient to obtain a referral" for a neurologist. I.A. does not challenge this particular analysis but she challenges the superior court's analogous reliance on I.A.'s appearing at neuropsychological testing as supportive of her capabilities.

[4] Liebert testified that in November 2019, she confirmed with Sound Mental Health that I.A. was in semi-regular attendance at treatment until she was incarcerated in December 2019 or January 2020. However, it is not clear if this was substance use treatment or mental health treatment. Desiree Ender, an administrative forensic program manager for Sound Mental Health, testified that I.A. attended "one in-person appointment after the intake was completed."

work with Dr. Milner through April or May 2020 to schedule appointments for I.A., but due to I.A.'s being in and out of incarceration and COVID-19, I.A. did not complete the evaluation and Dr. Milner dropped the referral.

By April 17, 2020, I.A. had completed a parenting assessment and a drug and alcohol evaluation, but had not yet completed the services or treatment recommended pursuant to them. I.A. had been referred for UAs, but had not completed any. At a permanency planning hearing held June 25, 2020, I.A. was found to be regularly visiting the children while they were in the grandmother's care. However, I.A. was not in compliance with the court ordered services, and was not making progress toward correcting the deficiencies which led to the children being removed from I.A.'s care. At that time, the permanency plan was changed to adoption only with guardianship or third party custody as the alternative.

In October 2020, the Department referred I.A. to Dr. Steve Tutty for the ordered neuropsychological evaluation. I.A. missed the first appointment. The appointment was rescheduled, and the evaluation was completed on November 23, 2020.[5]

Dr. Tutty testified the referral letter "outlined . . . cognitive and neurological concerns." He stated the purpose of the neuropsychological evaluation was to "get a sense of [I.A.'s] neuropsychological status with respect to cognition, attention,

_____

[5] The record shows Dr. Tutty's report was marked as exhibit 49. Although the report was offered, and later reoffered, the court did not admit it into evidence, and the report is not before this court.

6

memory, [and] executive functioning." I.A. scored in the "borderline impaired range," which indicates "[I.A.] has some fairly extensive cognitive impairments across verbal, visual, and . . . working memory." I.A.'s score on the Wechsler Adult Intelligence Scale, Fourth Edition, was in the fourth percentile. This placed I.A. at 73 on the intelligence scale, which Dr. Tutty described as "bordering" intellectual deficiency. Other testing results indicated poor cognitive flexibility, severely impaired attention, and difficulty retrieving and retaining auditory information. Dr. Tutty testified these auditory deficits meant he was "very concerned with [I.A.'s] brain functioning." I.A.'s anxiety inventory test results were "in the severe level of anxiety." Dr. Tutty testified these results mean "from a parent standpoint, they . . . may be too consumed . . . with their own . . . fear and worrying that may interfere with just making everyday decisions or responding to every[day] needs and issues [for] their children."

Dr. Tutty diagnosed I.A. with "generalized anxiety" and "frontal lobe and executive functioning deficit." Dr. Tutty testified that an individual having "all this worry" that is "really consuming . . . their life," and going on "for months without any kind of resolution or abatement" was "consistent" with I.A.'s presentation and test outcomes. Dr. Tutty testified, "[I]t would appear that there's been . . . some kind of damage here to the front part of her brain." I.A. disclosed having experienced domestic violence involving physical force but did not disclose a specific injury with loss of consciousness. Dr. Tutty testified, "[I]t would be concerning to . . . have

7

children with . . . fragile medical needs under the care of a parent with these issues."[6]

Dr. Tutty's testimony supported the trial court's conclusion that I.A.'s substance use was an ongoing concern. Dr. Tutty testified that I.A. reported using alcohol and cannabis as a youth and that this "continued over time." I.A. reported methamphetamine use starting around age 20, which I.A. discontinued when she found out she was pregnant, and then resumed after the children were born. I.A. also disclosed that she used methamphetamine a few hours before speaking with Dr. Tutty. Cunningham testified based on her parenting assessment that I.A.'s disclosure of substance use within the last year would create a concern for reunification "because typically when a parent is using substances, that becomes [] either [their] higher priority or affects their ability to attend to other tasks." According to Liebert, due to I.A.'s erratic behavior, the Department had ongoing concerns I.A. was still actively using drugs. The Department was "concerned with [I.A.'s] ability if she is using to maintain a period of sobriety in order to appropriately address her ongoing mental health concerns as they continue to pre[s]ent issue[s] with her ability to make timely and appropriate decisions to prioritize her children." Liebert made "10 to 15 or more" referrals for I.A. to complete UAs. The Department did not receive any UA results, I.A. responded to referrals with "just no-shows or

---

[6] Dr. Tutty's report was not admitted at trial, but a reference in the Department's trial brief suggests that Dr. Tutty attributed the test results to I.A.'s "likely" having "sustained damage to her frontal lobe region, which could result from chronic drug abuse (e.g. methamphetamine), as well as [traumatic brain injuries]." Dr. Tutty's trial testimony is not inconsistent with his attributing I.A.'s test results to these potential causes.

cancelations." Because I.A. did not participate in the recommended substance use treatment recommended by Sound Mental Health, Liebert referred her to multiple providers for an updated evaluation to start substance use treatment.

Dr. Tutty recommended I.A. consult with a neurologist to determine if specific psychotropic medications may be warranted, work with a neurologist to implement visual cues to help retain auditory information, attend therapy for anxiety, work with a chemical dependency counselor or program that includes UA screening, attend weekly supervised visitation with the children, and keep in regular contact with the social worker. Dr. Tutty recommended visual cues because I.A. "may benefit by having those visual cues in her immediate environment" and stated the neurologist could help implement these cues in the home setting. Dr. Tutty testified, "We wouldn't know if that would be helpful until [I.A.] tries." When asked, "[C]ould visual cues be something like reminders?" Dr. Tutty responded "yes." When asked if a text message could be a visual cue, Dr. Tutty replied, "[I]t would really depend on how [I.A.] responds to those visual cues and [if] that helps her retain that auditory information. So, this is why that remediation service is . . . needed, is to really figure out what . . . can really help [I.A.] the best in improving that auditory retention and retrieval." Dr. Tutty stated the neurologist or the team could refer I.A. to remediation services. Dr. Tutty testified that I.A.'s risk likely would not decrease without engaging in the recommended services.

9

Liebert testified she "wasn't sure how to interpret" the recommendation that I.A. would benefit from visual cues, but hoped the neurologist would be able to explain it. Misinterpreting a reference in Dr. Tutty's report, Liebert initially believed I.A. already had a neurologist. Liebert discovered I.A. did not have a neurologist and needed assistance securing one in April or May 2021. Liebert said, "[M]y plan was to get [I.A.] connected with a neurologist and then to follow up with her neurologist on the recommendations that Dr. Tutty had." Leibert testified I.A. asked to have one of Cunningham's recommended services explained, but otherwise "understood the other recommendations," and responded "yes" when asked if I.A. "agree[d] to participate in all of the services" or "at least convey[ed] that sense" to Liebert.

Following receipt of Dr. Tutty's report, Liebert continued to send I.A. service letters that included Dr. Tutty's recommendations. Liebert had already reformatted her service letters to a table format, starting with the letter dated April 17, 2020, based on feedback she had received from other parents "to make it more friendly on the eyes." A letter dated July 22, 2021 states, "When we last spoke on [July 8,] 2021 you reported that you were going to locate a new [primary care physician] and have them refer you to a neurologist."

Liebert testified that in addition to the service letters, she followed up with I.A. "three times over the phone at the very minimum. And then there . . . may have been some text messages." Liebert testified that she was driving each time I.A. called her, so she was unable to connect I.A. to service providers via a three

10

way call, but she said, "[W]henever we would talk on the phone, we would talk about services." Liebert stated, "[W]hen [I.A.] called me, I answer[ed] because it was really hard to get ahold of her [be]cause if I [] call her back, she doesn't answer." Liebert did not ever receive confirmation that I.A. saw a neurologist.

Liebert testified to her written and telephonic communication with I.A. Liebert confirmed the address to which I.A. wished to have the letters sent. After service letters were returned marked "return to sender," Liebert began also e-mailing the service letters. Liebert texted I.A., and sent information about the children's appointments to an e-mail that was confirmed to be in use by I.A., as evidenced by I.A.'s responding to an e-mail and providing a new phone number. I.A. reached out to Liebert to update her phone and e-mail contact information a few times throughout the case. Throughout 2020, I.A. would occasionally respond to Liebert's texts, but that communication became "hit-or-miss" in 2021. Liebert offered to meet I.A. in person and provide transportation to services, or to provide bus fare to get to services. I.A. did not accept those offers, stating she could get to services.

D

The termination trial was held by videoconference September 20-28, 2021, with I.A.'s counsel appearing in person. I.A. did not appear for or participate in the trial. Liebert e-mailed the trial information, including the videoconference weblink, to an e-mail address that I.A. had provided.

11

At the time of trial, Aa.D.Y. and Al.D.Y. were both in school. Aa.D.Y. was excelling, and had tested into a kindergarten program at age four. Al.D.Y., who is deaf, was somewhat behind, and this was attributed to a language barrier based on Al.D.Y.'s primary communication being through ASL. Both children still had extensive medical care needs. Aa.D.Y. and Al.D.Y. required approximately four to five medical appointments every two months. These appointments included neurology, ophthalmology, and audiology visits. Al.D.Y. had a cochlear implant, and attended audiology appointments yearly, and speech therapy weekly and then bi-weekly during the dependency. Al.D.Y. had severe sleep apnea that required adenoid and tonsil removal and ongoing regular monitoring and check-in appointments every six months. Aa.D.Y. no longer needed a feeding tube, but sometimes needed a "thickening agent" to help consumption of liquids due to dysphagia. Aa.D.Y. also attended weekly speech therapy appointments. The grandmother had not observed I.A. care for the children when a medical concern arose, and I.A. had not attended a medical appointment for either Aa.D.Y. or Al.D.Y. in three and a half years. The grandmother testified that she did not believe I.A. had the ability to care for the children.

At the time of trial, I.A. was supposed to have visitation with Aa.D.Y. and Al.D.Y. every Thursday and every other Saturday, a schedule I.A. chose. However, I.A. was not attending visits as scheduled, and at times a month or two months passed without I.A. visiting her children. The grandmother estimated I.A. had visited 10 times in 2021. When I.A. visited, the grandmother had to translate

12

because AI.D.Y. uses ASL as her primary mode of communication, and I.A. had not learned to sign. The grandmother testified I.A. came to visits "with the smoke smell and with all the perfume," smells that affect Aa.D.Y.'s dysphagia and allergies. When asked to refrain from smoking or putting on perfume before visits, I.A. responded that she "doesn't see them enough [] to not smoke or put the perfume on."

I.A.'s counsel cross-examined Dr. Tutty about the significance of his using the term "intellectual deficiency." This followed up on Dr. Tutty's testifying that I.A.'s results, on the Wechsler Adult Intelligence Scale, were "bordering this intellectual deficiency area." I.A.'s counsel asked, "Is it just a tipoff to other scientific providers that this is an issue, or what's the significance of it?" Dr. Tutty answered,

> The significance–and it really depends on the person's adaptive functioning, but . . . the significance may mean that there is a significant developmental disability where accommodations may be warranted. So, for instance, in the school system, they may receive a[n] individualized education plan, or IEP. In vocational settings there may be developmental disability support to assist people with those intellectual disabilities.

I.A.'s counsel asked, "Are you familiar with any other accommodations that might be made for somebody who has a developmental disability?" Dr. Tutty answered, "It could be para-education support where a para-educator would assist them with various, you know, academic functions. There could be a job coach that could be warranted in vocational settings." Dr. Tutty never testified that I.A.'s results fell in the range he referred to as "intellectual disability," as opposed merely "bordering"

that range. Dr. Tutty also did not testify that I.A. had a developmental disability or an intellectual disability. On cross-examination, I.A.'s counsel asked Liebert, "[A]fter reviewing Dr. Tutty's report, did you have concerns about [I.A.] having a developmental disability?" Liebert answered, "Yes," and added that from reviewing the Department's database she was already partially "aware that there might have been some executive functioning issues."

E

The Department presented evidence that throughout the dependency and termination proceedings, I.A. was the subject of criminal charges, convictions, and resulting confinement. On December 18, 2018, I.A. pleaded guilty to driving while license suspended or revoked in the second degree and making a false statement to a public servant. On April 26, 2019, I.A. pleaded guilty to possession of a controlled substance, methamphetamine, and possession of drug paraphernalia. On May 2, 2019, I.A. pleaded guilty to third degree driving while license suspended. I.A. pleaded guilty to committing felony assault and misdemeanor third degree theft on May 30, 2019. I.A. pleaded guilty to committing felony attempt to elude a police vehicle on May 30, 2019. On January 23, 2020, I.A. pleaded guilty to second degree driving with license suspended, reckless driving, refusing to comply with police, third degree driving with license suspended, and obstructing public officers. I.A. pleaded guilty to committing third degree theft on June 15, 2021. Liebert testified I.A.'s periods of confinement interfered with her ability to visit the children, attend appointments, and participate in required services.

14

The superior court entered an order terminating I.A.'s parental rights to Aa.D.Y. and Al.D.Y. on October 20, 2021.

II

Under RCW 13.34.180(1)(d) and RCW 13.34.190(a)(i), the Department was required to show by clear, cogent, and convincing evidence that it "expressly and understandably" offered all "reasonably available" and "necessary" services capable of correcting a parent's deficiencies within the foreseeable future. We review the superior court's finding that the Department made this showing for substantial evidence. In re Parental Rights to D.H., 195 Wn.2d 710, 718, 464 P.3d 215 (2020).

I.A. contends that the Department did not understandably offer services because it had reason to believe I.A. had a developmental disability, but did not make reasonable efforts to ascertain the extent of the disability and in fact never reached a diagnosis one way or the other. As a result, I.A. contends, the Department did not tailor its offer of services to ensure the offer would be reasonably understandable to I.A. Further, I.A. contends, the Department did not offer tailoring that was informed by current professional guidelines for communicating with parents with similar disabilities and offered no evidence of such guidelines. I.A. contends that the Department's engaging Dr. Tutty to evaluate I.A.'s potential cognitive deficits was insufficient, because the Department had the more specific duty to determine whether I.A. had a disability, particularly a

15

developmental disability as defined for benefits eligibility purposes for the Department's Developmental Disability Administration (DDA).

A

"[W]here [the Department] has reason to believe a parent may have an intellectual disability, it must make reasonable efforts to ascertain the extent of the disability and how it could interfere with the parent's ability to understand and benefit from [the Department's] offer of services." In re Parental Rights to M.A.S.C., 197 Wn.2d 685, 699, 486 P.3d 886 (2021). "If reasonable efforts reveal the parent does have an intellectual disability, [the Department] must tailor its offer of services to ensure the offer is reasonably understandable to the parent." Id. "This tailoring must be informed by current professional guidelines and must accommodate the individual parent's needs rather than relying on broad-based or untested assumptions about the needs and abilities of people with intellectual disabilities." Id. "[T]he trial court must place itself in the position of an objective observer who is aware of the nature and extent of the parent's intellectual disability, as well as current professional guidelines for communicating with people who have similar disabilities." Id. at 700. Then, "[t]he court must . . . determine whether [the Department's] offer of services was reasonably understandable to the parent based on the totality of the circumstances." Id.

If evaluation reveals a developmental disability diagnosis, the Department is statutorily obligated as part of permanency planning to refer the parent to DDA to coordinate a care plan. RCW 13.34.136(2)(b)(i)(B); In re Parental Rights to

I.M.-M., 196 Wn. App. 914, 924, 385 P.3d 286 (2016).  In I.M.-M., this court reversed an order terminating a parent's rights because it concluded the Department failed to provide necessary services to a parent when it became aware the parent had cognitive impairments that would impact her ability to address parental deficiencies and failed to notify the parent's service providers.  196 Wn. App. at 917.  There, the parent promptly completed a psychological evaluation that revealed she had an intellectual impairment and might be developmentally disabled.  Id. at 918-19.  However, the evaluator never reached a final diagnosis because "he never performed the applicable testing."  Id. at 919.  The Department failed to prove it was excused from providing otherwise required services because I.M.-M. was "not a case where the parent's actions alone demonstrate the futility of additional services."  Id. at 925.  The parent "made notable efforts to engage in services and work with her providers.  She promptly obtained a mental health evaluation, a chemical dependency evaluation, and a parenting assessment."  Id. She also kept in basic touch with her social workers and " 'pretty consistent[ly]' " engaged in mental health therapy over the course of two years.  Id.

In M.A.S.C., the Department had reason to believe the mother might have an intellectual disability, but never obtained a clinical diagnosis, and never determined whether the mother in fact had an intellectual disability.  197 Wn.2d at 701.  The Department social worker testified that this was because the mother did not follow through on the recommendation to participate in an intellectual disability evaluation, but did not testify how she offered the evaluation to the mother and did

not testify to the details of her own efforts to obtain such an evaluation for the mother. Id. The service letters sent to the mother contained a list consisting of a mix of "intentions" and services themselves, as well as multiple attachments containing jargon that the social worker did not review with the mother. Id. at 694-95. The court held the Department had not met its burden to prove it offered services in a way that was reasonably understandable to the mother, and reversed the termination of parental rights. Id. at 705.

In In re Welfare of D.H., this court reversed a termination of parental rights when the Department failed to prove it had understandably offered services, or that a properly tailored offer of services would be futile, because it did not present evidence of applicable professional guidelines for communicating with individuals with the parent's disability. __ Wn. App. 2d ___, 523 P.3d 255 (2023). There, the parent was diagnosed with a developmental disability. Id. at 257. This was based on a neuropsychological examination by Dr. Tutty in 2017. Id. at 260. The parent's cognitive abilities were in the second percentile and executive functioning was below the first percentile. Id. The parent had actively participated in treatment and services, including completing three neuropsychological evaluations with Dr. Tutty, id. at 260-61, multiple parenting instruction courses, cumulatively over nine months of training, id. at 261-262, and a mental health evaluation, id. at 263. The parent was referred to the DDA and, after an appeal, was found eligible for limited services. Id. at 264. The parent declined these services without understanding their nature. Id. at 265. Social workers assigned to the parent's case were not

trained in the current guidelines for disability-friendly communication, and "most of [the parent]'s service providers were not trained in disability-friendly communication when they worked with [the parent]." Id. at 257-58.

B

We conclude the record here contains sufficient evidence to support the superior court's factual finding 2.13, that "[a]ll services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided to [I.A.]." (Emphasis omitted.)

The Department does not dispute that it had reason to believe that I.A. could have deficits in executive functioning, and it does not dispute on appeal that this concern made evaluation initially by a neuropsychologist appropriate in I.A.'s case. This concern triggered the Department's responsibility to "make reasonable efforts to ascertain whether the parent does in fact have a disability and, if so, how the disability could interfere with the parent's capacity to understand [the Department's] offer of services." M.A.S.C., 197 Wn.2d at 689. The neuropsychological evaluation with Dr. Tutty was responsive to the concern and was a reasonable effort to ascertain whether I.A. had a disability. I.A. missed several appointments, and the Department social worker continued to seek new referrals, schedule appointments, and work to remind I.A. to attend evaluations.[7]

---

[7] I.A. does not challenge the superior court's findings of fact 2.21(a)-(d), which state I.A. was referred to three different providers for neuropsychological

Dr. Tutty conducted a battery of tests that he deemed appropriate in light of the Department's referral, which he testified outlined "cognitive and neurological concerns." Dr. Tutty did not diagnose I.A. with an intellectual or other developmental disability, but instead diagnosed her with generalized anxiety disorder and "frontal lobe and executive functioning deficit." Dr. Tutty did not recommend referral to the DDA, but to a neurologist, based on his belief that medication could assist with I.A.'s functional status and that brain scans might be recommended to better understand her deficits. He referred to the possibility of I.A.'s having a brain injury and expressed significant concern for her level of anxiety, indicating I.A.'s reported level of anxiety was "consistent" with I.A.'s presentation and test outcomes.

The Department also presented evidence that it tailored its offer of services to ensure it was "expressly and understandably" made in light of I.A.'s individual needs. RCW 13.34.180(1)(d); M.A.S.C. 197 Wn.2d at 699. The Department did so here by proceeding in light of Dr. Tutty's evaluation and recommendations to connect I.A. with additional services. Dr. Tutty testified that his two diagnoses for I.A. were "generalized anxiety," and "frontal lobe and executive functioning deficit." Dr. Tutty did not mention developmental disability in his evaluation, let alone indicate it was a likely diagnosis either during the dependency or termination

evaluation. The Department referred I.A. to Dr. Connor in 2018, but I.A. did not attend the scheduled evaluation. The Department referred I.A. to Dr. Milner and sought to schedule multiple appointments between November 2019 and April 2020, but I.A. was not able to complete the evaluation because she was in and out of incarceration and because of COVID-19. The Department referred I.A. to Dr. Tutty in October 2020. I.A. missed the first appointment but completed the evaluation in October 2020.

proceedings. Liebert provided information about the recommended services and reminders in written form through service letters and e-mails in addition to speaking with I.A. on the phone. Unlike the parents in M.A.S.C., I.M.-M., and D.H., who engaged with services but struggled to complete them or show improvement due to lack of understanding, I.A.'s lack of engagement following Dr. Tutty's assessment fell into a pattern of sustained nonengagement over the entire dependency. This was never attributed to intellectual or other developmental disability but, in I.A.'s case, factors possibly contributing to her nonengagement included a diagnosis of anxiety with evidence of substance use and criminal-justice involvement. I.A. initiated services by attending a parenting assessment and a mental health and drug and alcohol assessment within the first 16 months of the children being removed from her care, and she saw Dr. Tutty approximately two and a half years after they were removed, but otherwise I.A. did not engage with services. This provides substantial evidence supporting the superior court's conclusion that I.A. subjectively understood the manner in which services were being offered and chose not to participate.

I.A. nevertheless contends that the Department's obtaining Dr. Tutty's evaluation was not sufficient, because evaluating I.A.'s potential cognitive difficulties for which the Department had concern did not satisfy what I.A. asserts is a specific requirement of M.A.S.C.—that the Department determine whether I.A. had a disability. The record shows that the Department was responsive to the individual challenges that I.A. faced. During the dependency and termination

21

proceedings, these were identified as executive functioning or cognitive deficits, which Dr. Tutty attributed to brain injury and possibly substance use, and which Dr. Tutty believed needed to be evaluated for treatment with medications and through further consultation with a neurologist. At trial, I.A.'s counsel brought up the possibility of developmental disability on cross-examination first of the Department social worker and second of Dr. Tutty. Neither testified they believed I.A. had a developmental disability, though both acknowledged I.A. showed challenges in executive functioning. Further, the testimony of Dr. Tutty on which I.A. relies on appeal was only that the significance of the term "intellectual disability" "may" mean that there is a developmental disability. But Dr. Tutty never testified that I.A.'s test results fell into the range he referred to as "intellectual disability" or that I.A. had, or potentially had, a developmental disability. This contrasts with D.H., in which Dr. Tutty diagnosed a developmental disability based on an assessment similar to the one he performed here.

M.A.S.C. emphasizes attention to the parent's individualized needs. In M.A.S.C., the Department had obtained a diagnostic assessment of the parent's "psychiatric and mental health issues," but did "not" evaluate the parent's "intellectual disabilities," and the Department social worker did not "testify as to how, exactly, she offered an intellectual disability evaluation." 197 Wn.2d at 701. The court's discussion focused on "intellectual disability," but distinguished that disability from "developmental disability," which is "a broader term that includes intellectual disabilities as well as other conditions," and from "[m]ental illness." Id.

22

at 688 n.2. The court noted, "[T]he principles we set forth in this opinion may apply in other cases where mental illness or other forms of parental disabilities are at issue." Id. The court recognized that the Department's tailoring of services must reflect the parent's "individual needs." Id. at 699 (citing RCW 13.34.180(1)(d)). In criticizing the Department's failure to determine whether the parent had a disability, the court faulted the Department's failure to obtain an "appropriate" evaluation. Id. at 701-02. This reasoning does not suggest that the Department in this case was required to rule in or rule out developmental disability when no professional adverted to that as a likely diagnosis after an examination capable of discovering it, and when the recommendation for I.A. was to obtain treatment for anxiety and consult with a neurologist regarding medication, other adaptive strategies, and possible traumatic brain injury.

The same reasoning answers I.A.'s arguments that the Department presented no evidence of current professional guidelines, that the Department failed to establish the Department communicated with I.A. in light of these guidelines, and that the superior court did not have sufficient information to adopt the perspective required by M.A.S.C. Unlike in D.H., where the parent had an intellectual disability, the specific requirement to communicate with I.A. in the manner appropriate to a person with a developmental disability was not triggered here because no intellectual or other developmental disability was identified in I.A.'s evaluations. M.A.S.C. explained the need for current professional guidelines as being "because judges and attorneys do not have specialized training in

communicating with individuals with intellectual disabilities and, therefore, cannot reliably determine what is appropriate and understandable in that context." 197 Wn.2d at 702. The recommendations of Dr. Tutty provided the best insight on the assistance that I.A. needed. I.A.'s mental health and drug and alcohol evaluation, the parenting assessment, and the neuropsychological evaluation pointed to needs for addressing anxiety and substance use, and none of them identified developmental disability as a concern. Substantial evidence supports the superior court's conclusion that the Department understandably offered services to I.A., and did so consistent with M.A.S.C.'s requirements, by making reasonable efforts to ascertain whether I.A. had any individual disabling conditions and tailoring its services to I.A.'s individual needs.

On appeal, in analyzing the trial court's conclusions about the Department's offer of services, I.A. cites Alice Abrokwa, *"When They Enter, We All Enter": Opening the Door to Intersectional Discrimination Claims Based on Race and Disability*, 24 MICH. J. RACE & L. 15, 36-37, 40, 44 (2018), research supporting her argument that "Black parents with disabilities face enhanced discrimination." "Decisions in child welfare proceedings 'are often vulnerable to judgments based on cultural or class bias,' given that poor families and families of Color are disproportionately impacted by child welfare proceedings." In re Dependency of K.W., 199 Wn.2d 131, 155, 504 P.3d 207 (2022) (quoting Santosky v. Kramer, 455 U.S. 745, 763, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)). As a result, the court held, citing GR 37, "actors in child welfare proceedings must be vigilant in

preventing bias from interfering in their decision-making." Id. at 156. Such actors must guard against reliance on factors that serve as proxies for race in child placement decisions. Id. Washington decisions have acknowledged in this and other contexts implicit racial bias is so common and pervasive that it inevitably exists "at the unconscious level, where it can influence our decisions without our awareness." State v. Berhe, 193 Wn.2d 647, 657, 444 P.3d 1172 (2019).

GR 37 provides a framework for analyzing bias during jury selection, and Washington decisions have applied this analysis by analogy to criminal verdicts, Berhe, 193 Wn.2d at 664-65, search and seizure, State v. Sum, 199 Wn.2d 627, 640-41, 511 P.3d 92 (2022), and civil verdicts, Henderson v. Thompson, 200 Wn.2d 417, 434-35, 518 P.3d 1011 (2022). These decisions adopt a two step inquiry in which, in case of reason to believe that racial bias has affected a verdict, the court first determines whether an objective observer who is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State could view race as a factor in the verdict. Henderson, 200 Wn.2d at 435. If a prima facie showing is made meeting this standard, then the trial court is to presume that racial bias affected the verdict, and the party benefiting from the alleged racial bias has the burden to prove it did not. Id.

I.A. ties the prevalence of race-based discrimination in child welfare proceedings to M.A.S.C.'s requirement that the Department tailor its offer of services to the individual parent's needs rather than assumptions about people

with disabilities and that the trial court adopt the position of an objective observer in evaluating the offer. 197 Wn.2d at 699-700. I.A. argues implicit bias affected the termination proceedings based on a comment by the trial court in its oral ruling, which was incorporated into the court's written findings. In distinguishing I.M.-M. by contrasting the parent's engagement in that case with I.A.'s, the trial court stated, "In this case, the Department did investigate. But its investigation about [I.A.'s] needs was thwarted by her refusal to participate in services related to that investigation, namely, going to a primary care physician." This was followed with a finding that "the mother has not connected with a primary care provider" and a finding generally incorporating the court's oral ruling.

We acknowledge that race-based discrimination exists in child welfare proceedings. And we agree with I.A. the terminology "thwarted" and "refusal" implies more than the mere fact of I.A.'s nonengagement, it implies a choice by I.A. not to engage, and depending on the force attributed to those verbs, potentially a deliberate one. In context, however, we are not convinced the trial court's language is a signal of bias, as opposed to an assessment of I.A.'s behaviors relevant to her ability to parent the children. A parent's behaviors are relevant to assessing whether the Department expressly and understandably offered services when it is true, as it is here and was in I.M.-M., that the parent's engagement with services did not occur. The trial court was observing that I.A.'s behaviors suggest a different conclusion about why engagement did not occur, despite an offer of services, than the facts did in I.M.-M., where the parent demonstrated consistent

26

attempts to engage. That the trial court was appropriately focused on I.A.'s actions is supported by its use of language on the next page of the transcript lacking the implication I.A. attributes. In discussing whether conditions would be remedied in the near future, the trial court stated I.A. "has not engaged in her court-ordered services such that she could safely parent" the children. We take the Supreme Court's holding in K.W. as requiring Department personnel, counsel, and judicial officers at all stages to reflect on and guard against their own implicit biases influencing the course of child welfare cases. In this case, I.A. has not demonstrated a risk that bias affected the termination proceedings because no party raised or perceived such a risk or raised the issue in the trial court, the trial court's oral comments regarding I.A.'s blameworthiness are equivocal when taken out of context but are not when read in light of the overall ruling, and the facts of this case are clearly distinguishable from I.M.-M.

I.A. argues that the information available to the Department in her case was sufficient to trigger a mandatory referral to the DDA. M.A.S.C. states that the Department must tailor its offer of services in a manner informed by current professional guidelines, "if reasonable efforts reveal that the parent does have an intellectual disability." 197 Wn.2d at 699. I.M.-M. notes there is a statutory mandate for referral to the DDA during permanency planning, again triggered by "a comprehensive mental health examination revealing a developmental disability." 196 Wn. App. at 924; see also RCW 13.34.136(2)(b)(i)(B) ("The permanency plan shall include: . . . If a parent has a developmental disability

according to the definition provided in RCW 71A.10.020, and that individual is eligible for services provided by [the DDA], the department shall make reasonable efforts to consult with [the DDA] to create an appropriate plan for services."). Both decisions observe that the Department does not justify either not tailoring services or not making a DDA referral during permanency planning by " 'inexplicably failing to investigate the likelihood a parent is developmentally disabled.' " M.A.S.C., 197 Wn.2d at 699 (quoting I.M.-M., 196 Wn. App. at 924). M.A.S.C. and I.M.-M. do not state that a DDA referral must be made when, despite examination targeted to a parent's individualized potential disabling conditions, a developmental disability is not revealed.

I.A. argues that Dr. Tutty should have performed further testing, which I.A. implies would have conclusively ruled in or ruled out developmental disability. I.A. does not show that she was an appropriate candidate for a DDA referral or that the DDA would have treated such a referral in the manner suggested. The statutory definition of "developmental disability" on which a mandatory referral depends includes in part, "a disability attributable to intellectual disability, cerebral palsy, epilepsy, autism, or another neurological or other condition of an individual found by the secretary to be closely related to an intellectual disability or to require treatment similar to that required for individuals with intellectual disabilities." RCW 71A.10.020(6). I.A. points only to a possible "intellectual disability" from among these conditions, but the record does not show she met the statutory definition of "intellectual disability."

28

DDA eligibility rules are established in chapter 388-823 WAC. Regulations define "intellectual disability" as requiring that a DDA applicant "must" have a diagnosis of "intellectual disability as specified in the DSM-5"[8] made by "a licensed psychologist" among other qualified professionals. WAC 388-823-0200. Dr. Tutty is a licensed psychologist and relied on the DSM-5 to evaluate I.A. But Dr. Tutty's testing did not produce results in the range he associated with intellectual disability.

Regulations further require that, if an applicant has an "eligible condition of intellectual disability," in order to meet the definition of "substantial limitations" the applicant must have "[d]ocumentation of a full-scale intelligence quotient (FSIQ) score of more than two standard deviations below the mean." WAC 388-823-0210(1). The regulations define this as a score of "69 or less" on the Weschler intelligence scales, but Dr. Tutty scored I.A. at 73 on the Weschler scale.[9] WAC 388-823-0720(4). A further condition is that the FSIQ score "cannot be attributable to mental illness or other psychiatric condition." WAC 388-823-0720(2). Dr. Tutty did not specifically testify that I.A. had a "mental illness" or a "psychiatric condition."

[8] Dr. Tutty testified that "DSM-5" refers to "the fifth edition of the Diagnostic and Statistical Manual." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5).

[9] We recognize, as the legislature has, that intelligence quotient testing is a problematic means of assessing intellectual functioning. In 2022, the legislature amended the statutory definition of "developmental disability" to require that, "[b]eginning July 1, 2025, the [DDA] may not use intelligence quotient scores as a determinant of developmental disability." Laws of 2022, ch. 277, § 3; RCW 71A.16.020(2). This is based on legislative findings that "requiring intelligence quotient testing to determine if a person has an intellectual or developmental disability is expensive, inaccessible to marginalized communities, complicated to receive, and time consuming for families already struggling to care for their child with an intellectual or developmental disability" and that "intelligence quotient testing does not accurately indicate whether a person needs support to be personally and socially productive." Laws of 2022, ch. 277, § 1.

However, his testimony that I.A. had generalized anxiety disorder consistent with his test results and Dr. Tutty's concerns for substance use, suggest a further reason why his assessment would not point to I.A.'s having a developmental disability based on meeting statutory criteria for an intellectual disability.

Finally, showing "substantial limitations" for DDA eligibility also requires "[d]ocumentation" of an "adaptive skills test score of more than two standard deviations below the mean." WAC 388-823-0210(2). I.A. argues that, upon referral to DDA, it would have supplied any necessary adaptive skills testing. This argument appears to be based on WAC 388-823-0740(1)(d), which states, regarding adaptive skills testing, that "only if results from one of the other acceptable tests are not available," then the "DDA will administer or arrange for the administration" of one of the adaptive skills assessments. But the DDA eligibility criteria first required a DSM-5 diagnosis of intellectual disability and a qualifying FSIQ score, neither of which I.A. demonstrated in Dr. Tutty's evaluation and testing. This case does not present the issue of whether I.A. meets the DDA eligibility criteria, and we do not make such a decision. We conclude I.A. does not show that the DDA would have provided an adaptive skills assessment if a DDA referral had occurred, and the record before the Department in this case did not trigger a mandatory DDA referral.

III

In addition to the record's containing sufficient evidence to support the superior court's finding that the Department understandably offered necessary

30

services, the Department is "excused from providing otherwise required services if doing so would be futile." I.M.-M., 196 Wn. App. at 924.

The superior court found, "[I.A.] is not likely to remedy her parental deficiencies in the near future based on her unwillingness to participate in services during the life of the dependency case. As such, the Department is excused from offering additional services that might have been helpful." Unchallenged findings of fact support the trial court's conclusion. The superior court found, and I.A. does not challenge on appeal, "Liebert took on an active role in reminding [I.A.] about her services and how to access them in an understandable way that she could understand. [I.A.] did not express any confusion about the offered services." I.A. used the same kind of contact information in Liebert's service letters to access services throughout the dependency, but was inconsistent in following through after initial intakes. In addition, the superior court found, "[I.A.] has minimally participated in available visitation," and "[I.A.'s] failure to attend visits . . . was not due to mitigating circumstances." Unlike I.M-M. and D.H., in which the parents' actions demonstrated effort to engage with services, I.A.'s lack of effort to engage over the three-and-a-half-year dependency despite demonstrated ability supports the superior court's conclusion that additional services would have been futile.

IV

I.A. argues the superior court improperly found there was little likelihood I.A. would remedy her deficiencies in the near future. I.A. argues that the "court's error requires reversal because it relied solely on the statutory presumption to find [I.A.]

31

was not likely to remedy her deficiencies in the near future." We disagree there was error in the superior court's application of the presumption, and we further conclude the superior court did not rely solely on the presumption in reaching its decision.

RCW 13.34.180(1)(e) reads in relevant part, "A parent's failure to substantially improve parental deficiencies within 12 months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." I.A. takes issue with the superior court's oral ruling, and written finding 2.28(d) which states, "[I.A.] has not substantially improved her parental deficiencies within the last 12 months." I.A. interprets this to mean "the 12-month period immediately preceding the termination trial in September 2021." This argument ignores two other unchallenged findings. Finding of fact 2.28(e) was that, "[I.A.'s] failure to substantially improve her parental deficiencies within 12 months following the entry of the dispositional order gives rise to the rebuttable presumption under RCW 13.34.180(1)(e)." Finding of fact 2.32(a) was that, "[I.A.] has failed to substantially improve her parental deficiencies within the 33 months following the entry of the dispositional orders." The superior court therefore considered the appropriate 12 month period triggering the statutory presumption, and further found I.A.'s lack of substantial improvement occurred over the entire period following entry of the dependency order. As described above, there was

substantial evidence that I.A. did not attend ordered services and did not make progress toward correcting her deficiencies.

Further, the presumption was not the sole basis of the superior court's finding. I.A. does not challenge the superior court's finding that the near future for Aa.D.Y. and Al.D.Y. was two to three months. Nor does I.A. challenge the finding that, "it is incredibly unlikely that [I.A.] will substantially correct her identified parental deficiencies in six months, let alone a few months." Given these unchallenged findings, even if the superior court had erred in its application of the presumption, its finding that there was little likelihood I.A. would remedy I.A.'s deficiencies in Aa.D.Y.'s and Al.D.Y.'s near future was independently supported by substantial evidence.

Affirmed.

_Birk, J._

WE CONCUR:

_Smith, C.J._          _Andrus, J.P.T._